[No. B130842. Second Dist., Div. Seven. Sept. 8, 1999.]

HAJI JEFRI BOLKIAH et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
BIJAN FRAGRANCES, INC., et al., Real Parties in Interest.

**COUNSEL**

Cogswell, Woolley, Nakazawa & Russell, Forrest R. Cogswell, David E. R. Woolley, Mitchell F. Ducey and Thomas H. Van Horn for Petitioners.

No appearance for Respondent.

Arnold & Porter, John J. Quinn, Laurence J. Hutt and Sean Morris for Real Parties in Interest.

**OPINION**

**JOHNSON, J.**—The superior court denied petitioners' motions to quash service of the summons and complaint for allegedly defective service of process. Petitioners contend they qualify as "foreign states," thus, to be effective, service had to be made according to the requirements of the Foreign Sovereign Immunities Act (28 U.S.C. § 1602 et seq.). In the alternative, petitioners contend real parties in interest's attempts at service of process under California law were deficient and therefore ineffective for the superior court to acquire personal jurisdiction over them. Accordingly, petitioners request a writ of mandate to compel respondent superior court to grant their motions to quash.

We find the record evidence does not establish petitioners were either "political subdivisions of a sovereign state" or "instrumentalities of a foreign state." Accordingly, we conclude the instant case does not implicate the Foreign Sovereign Immunities Act for service of process or otherwise. We further conclude the trial court did not abuse its discretion in determining

service of process under California law was adequate to acquire personal jurisdiction over petitioners. We therefore deny petitioners' request for a writ of mandate.

## FACTS AND PROCEEDINGS BELOW

The following factual summary is derived from the allegations of real parties in interest's complaint.

Petitioner Haji Jefri Bolkiah is the brother of the Sultan of Brunei Darussalam and a prince of the monarchy (Prince Jefri). Petitioner Haji Hakeem Bolkiah (Prince Hakeem) is Prince Jefri's oldest son and the Sultan of Brunei Darussalam's nephew. Petitioner Haji Mohammad Junaidi Abdul Rahman (Haji Junaidi) is Prince Hakeem's primary assistant.

In May 1997, Prince Jefri, through an agent, contacted real party in interest Bijan Pakzad at his business real party in interest Bijan Fragrances, Inc. (collectively Bijan) in Beverly Hills to arrange a meeting. Bijan met with Prince Jefri and the Prince's representative Micha Raines in Paris, France. At the meeting Prince Jefri advised Bijan he was developing a luxury hotel at a high-end resort in Brunei Darussalam known as the Jerudong Park. Prince Jefri expressed interest in having Bijan design and manufacture exclusive fragrances and amenities to place in the rooms and suites of the hotel. Bijan and Prince Jefri discussed the nature of the Jerudong Park Hotel SDN, BHD and the kinds of elite fragrances and amenities which would be appropriate for the anticipated wealthy clientele. Prince Jefri arranged for Bijan to meet with his son Prince Hakeem, the designated chairman of the hotel, in London, England.

Bijan met with Prince Hakeem and his assistant Haji Junaidi in London, England on May 31, 1997. At this meeting Prince Hakeem agreed the first step would be for Bijan to design prototypes of the fragrances, logos and containers for his and his father's approval. Prince Hakeem told Bijan to submit a cost proposal for the prototypes which Bijan did the same day. Shortly thereafter Princes Jefri and Hakeem approved the cost proposal for the prototypes and wire-transferred $2.5 million to Bijan in early June to cover the cost of development of the prototypes.

In June 1997 Bijan wrote to Prince Jefri's assistant Ms. Raines to request specific information about the hotel in order to assist in the design of the prototypes. Ms. Raines wrote back to inform Bijan she was currently traveling with Prince Jefri and would supply the information as soon as they returned to Brunei Darussalam. Ms. Raines also informed Bijan that Prince Jefri and Prince Hakeem had requested Bijan to design unique scents for their personal use as well.

Also in June 1997 Haji Junaidi advised Bijan that Princes Jefri and Hakeem wished to keep their dealings confidential. Later in June Bijan received a fully executed confidentiality agreement prepared by Prince Jefri's and/or Prince Hakeem's solicitors, which Bijan returned to Haji Junaidi as directed. In response Haji Junaidi wrote Bijan to "confirm that I have received your courriered mails and I really appreciate your cooperation in signing the agreements. . . ."

Periodically Prince Jefri and Prince Hakeem ordered specially designed articles of Bijan clothing. Thus in one letter Ms. Raines informed Bijan: "I have coordinated with one of our personal offices in Beverly Hills to assist with the shipping of any and all merchandise or samples you may need to forward in the future. Our representatives will arrange for delivery. . . . Their address and contact is:

"Attention: Mrs. Cinna Hui
"SILVERCREST, Inc.
"904 Hartford Way
"Beverly Hills, CA 90210

"When sending packages please forward them to the Silvercrest office and they will arrange prompt delivery."

After a series of written correspondence between Bijan and Haji Junaidi or Ms. Raines, Bijan and his representatives made a presentation of the prototype fragrances to Prince Jefri, Prince Hakeem, Ms. Raines, Haji Junaidi and Jefri's two other children at the Dorchester Hotel in London, England on October 19, 1997.

The following day Bijan and his representatives made a similar presentation to four directors of the Jerudong Park Hotel SDN, BHD.

On October 24, 1997, Haji Junaidi wrote Bijan and enclosed a summary of the type and quantity of the products Princes Jefri and Hakeem wanted to order for the hotel—1,675,000 items at a projected cost of $48,314,500. Bijan prepared a formal purchase order detailing the items they had selected, the quantity per item, the unit price and the aggregate price, on both a per unit basis and for all the 1,675,000 items ordered. Bijan informed Haji Junaidi manufacturing could begin as soon as the purchase order was dated, executed, and returned to Bijan with an advance deposit of $24,157,250.

In response, on November 17, 1997, Haji Junaidi dated and countersigned Bijan's cover letter on behalf of Princes Jefri and Hakeem agreeing to pay at least $48,314,500; he wire-transferred a 50 percent deposit of $24,157,250 to Bijan in Beverly Hills; and, dated and signed the purchase order.

On the same day Haji Junaidi advised Bijan that Princes Jefri and Hakeem had wire-transferred an additional $12.5 million to Bijan: $2.5 million was to compensate Bijan for design costs of the high-end prototypes designed for the hotel and $10 million was designated for specially designed fragrances for Prince Jefri's and his three children's personal use.

Over the next several months Bijan wrote regularly to Ms. Raines, Haji Junaidi and Princes Jefri and Hakeem to apprise them of his company's progress in manufacturing the hotel fragrances and in developing the personal fragrances. After much negotiation the parties met in London, England in April 1998. At this meeting Bijan presented the prototype personal fragrances.

Approximately two weeks later Bijan received a letter from Solicitor Julian James of London, England. In his letter Mr. James stated he had been hired to review Bijan's proposal for personal fragrances for Prince Jefri and his children prior to any formal commitment. Mr. James suggested he meet with Bijan in Los Angeles to discuss possible alternatives to the product. Ultimately Bijan met with Mr. James's designees in Los Angeles, who were attorneys hired by petitioners. At the meeting the attorneys told Bijan that Prince Jefri would not be placing an order for personal fragrances and was canceling the order for the hotel project. These actions were confirmed in a letter sent to Bijan from representatives of the Jerudong Park Hotel SDN, BHD.

After informal negotiations failed Bijan filed suit on July 2, 1998, requesting damages and attorney's fees, including damages for breach of contract in the amount of $21,526,795. The complaint, by amendment, names as defendants three corporations: Jerudong Park Hotel SDN, BHD, Amedeo Corporation SDN, BHD and Amedeo Development Corporation SDN, BHD. The latter two corporations are allegedly wholly owned by Prince Jefri. The complaint also names as defendants Prince Jefri Bolkiah, Prince Hakeem Bolkiah and Haji Junaidi, petitioners in this writ proceeding.

On July 30, 1998, Bijan mailed copies of the summons and complaint in English via certified mail (return receipt requested) to each of the petitioners to all addresses in Brunei Darussalam, England and Beverly Hills the petitioners supplied to Bijan in their course of dealing. Bijan also mailed copies of the summons and complaint to Mr. Julian James in England and to Ms. Raines in Beverly Hills in care of Silvercrest, Inc.

Petitioners did not return signed receipts to Bijan.

In August 1998 Bijan learned Prince Jefri might be staying at apartments at the family-owned Plaza Hotel in New York City. Over the course of

several days process servers attempted to personally serve Prince Jefri with the summons and complaint but were thwarted in their attempts by hotel personnel and personal guards. On August 21, 1998, the process server "served" a copy of the summons and complaint on the security supervisor for the hotel and subsequently mailed copies of both to Prince Jefri at the hotel.

On August 26, 1998, Bijan again sent copies of the summons and complaint to petitioners at locations in Brunei Darussalam, England and Beverly Hills via Federal Express.

Again petitioners did not return signed receipts to Bijan.

Thereafter the superior court granted Bijan's request for service by publication presumably because of the absence of signed receipts. In November 1998 Bijan published a copy of the summons and complaint in The Los Angeles Times and New York Post. Also in November 1998, and during the course of publication, the corporate defendants removed the case to federal court. In January the corporate defendants stipulated the federal court action be remanded to state court.

In February 1999 petitioners moved the superior court to quash service on the grounds Bijan had not complied with the requirements of the Foreign Sovereign Immunities Act for service, and even if the act did not apply to them, service was deficient under California law as well. The superior court denied their motions to quash and petitioners sought extraordinary relief in this court. We issued an order to show cause to review the superior court's ruling.

DISCUSSION

I. *The Record Evidence Is Insufficient to Establish the Foreign Sovereign Immunity Act Is Applicable in This Case.*

Petitioners correctly argue once a defendant files a motion to quash the burden is on the plaintiff to prove by a preponderance of the evidence the validity of the service and the court's jurisdiction over the defendant. (*Banco Metropolitano* v. *Desarrollo de Autopistas* (S.D.N.Y. 1985) 616 F.Supp. 301, 304 ["Although the burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is on the plaintiff, until an evidentiary hearing is held the plaintiff need make only a prima facie showing that jurisdiction exists" (italics omitted)]; *Floveyor Internat., Ltd.* v. *Superior Court* (1997) 59 Cal.App.4th 789, 793 [69 Cal.Rptr.2d 457].) Petitioners also

correctly note a defendant is under no duty to respond to a defectively served summons and may stand mute until a plaintiff makes such a showing to the satisfaction of the court. (*Taylor-Rush* v. *Multitech Corp.* (1990) 217 Cal.App.3d 103, 111 [265 Cal.Rptr. 672].)

Normally we would resolve this fundamental question at the outset. However petitioners' request for writ review raises a threshold issue—whether service according to the requirements of the Foreign Sovereign Immunities Act (FSIA) (28 U.S.C. § 1602 et seq.), rather than under California law, was mandatory in this case. We must thus initially decide whether the FSIA applies in this case to determine whether the trial court was correct in its implicit finding service was effective to give the court jurisdiction over petitioners.

■ The FSIA is the sole basis for obtaining jurisdiction over a "foreign state," its "political subdivisions" and "agencies or instrumentalities." Subject matter jurisdiction over a foreign state depends on the existence of one of the exceptions to immunity specified in the FSIA. The existence of subject matter jurisdiction under FSIA is a question of law reviewed de novo. (*In re Estate of Ferdinand Marcos, Human Rights Lit.* (9th Cir. 1994) 25 F.3d 1467, 1470.)

Petitioners agree this case implicates the commercial activity exception to immunity set forth in the FSIA. (28 U.S.C. § 1605(a)(2).) However, the parties disagree whether petitioners are "foreign states" and thus whether the FSIA is even applicable to this case.

In this petition Prince Jefri alleges as a prince in a monarchy, and the brother of the sultan, he qualifies as a "political subdivision" or "agent or instrumentality" of a foreign state under the FSIA. Similarly, Prince Hakeem alleges as a prince in a monarchy, the son of Prince Jefri, and the nephew of the sultan, he also qualifies as a "political subdivision" or "agent or instrumentality" of a foreign state under the FSIA. Haji Junaidi argues he is an agent and primary assistant of Prince Hakeem and as such is an "agent or instrumentality" of a member of the royal family of the monarchy of Brunei Darussalam. He also alleges as deputy controller of customs and excise for the Sultanate of Brunei he is an "agent or instrumentality" of the foreign state of Brunei Darussalam.

A "foreign state" for all purposes under the act—except service requirements—includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ." (28 U.S.C. § 1603(a).)

The FSIA does not define "political subdivision of a foreign state." However, the legislative history of the act indicates the term refers to

subordinate governmental entities such as provinces, cantons, counties, municipalities or the like. The legislative history of the FSIA notes for all purposes of the act except service the term "foreign state" "includes not only the foreign state but also political subdivisions, agencies and instrumentalities of the foreign state. The term 'political subdivisions' includes all governmental units beneath the central government, including local governments." (H.R. No. 94-1487, Pub.L. No. 94-583, 94th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. & Admin. News, p. 6613.)

■    Service of process on the sovereign state itself or its political subdivisions must strictly comply with the requirements of the FSIA, providing for service of process through diplomatic channels in the absence of a separate prior arrangement between the parties for service.[1] (See, e.g., *Finamar Investors Inc.* v. *Republic of Tadjikistan* (S.D.N.Y. 1995) 889 F.Supp. 114, 117.) At least one court has noted the provisions of 28 United States Code section 1603(a) specifying requirements for service on a sovereign state or its political subdivisions has never applied to an individual. (*Flatow* v. *Islamic Republic of Iran* (D.D.C. 1998) 999 F.Supp. 1, 26.) Indeed, the legislative history of the act specifies the term "foreign state" in the service provision of 28 United States Code section 1608 "refers only to the sovereign state itself." (H.R. No. 94-1487, Pub.L. No. 94-583, 94th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. & Admin. News, p. 6613.)

The FSIA defines an "agency or instrumentality" of a foreign state as "any entity—[¶] (1) which is a separate legal person, corporate or otherwise, and

---

[1]Service of process on a sovereign state or its political subdivisions must comply with the service requirements of 28 United States Code section 1608(a), the exclusive means for service of process on a "foreign state" or a "political subdivision of a foreign state." (See, e.g., *Transaero, Inc.* v. *La Fuerza Aerea Boliviana* (D.C. Cir. 1994) 30 F.3d 148, 154 [308 App.D.C. 86] [core function of the armed forces was governmental and thus part of the sovereign state; accordingly substantial compliance with service of process requirements of the FSIA was inadequate].)

As relevant here, 28 United States Code section 1608(a) requires service on sovereign states or their political subdivisions be made "(3) if service cannot be made under paragraphs (1) [special arrangement] or (2) [Hague Service Convention], by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

"(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."

[¶] (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and [¶] (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country." (28 U.S.C. § 1603(b).)

The FSIA's requirements for service of process on an "agent or instrumentality of a foreign state" are less stringent and may be adequate if "reasonably calculated to give actual notice." (28 U.S.C. § 1608(b)(3).) Because of Congress's different treatment between the sovereign state itself and its agents or instrumentalities, several courts have held service of process on entities falling within the latter category is adequate if the plaintiff substantially complies with the service requirements of 28 United States Code section 1608(b) which does not require service through diplomatic channels.[2] (See *Straub* v. *A P Green, Inc.* (9th Cir. 1994) 38 F.3d 448, 453 [formally adopting substantial compliance standard for the FSIA in circumstances where plaintiff can prove the defendant received actual notice of the lawsuit and that the defendant was not prejudiced by the lack of compliance]; *Harris Corp.* v. *National Iranian Radio, etc.* (11th Cir. 1982) 691 F.2d 1344, 1352 [summons and complaint not translated into Farsi nor transmitted by clerk of the court substantially complied with service requirements]; *Doty* v. *Magnum Research, Inc.* (N.D.Ohio 1997) 994 F.Supp. 894, 897 [service on a local entity not designated as an agent for service of process for an "agent or instrumentality" of the state of Israel substantially complied with the FSIA because the defendant had actual notice and suffered no prejudice from the erroneous service]; *Banco Metropolitano* v. *Desarrollo de Autopistas, supra,* 616 F.Supp. at p. 304 ["In view of service on the consulate in New York, and in view of the receipt of actual knowledge of the summons and complaint in Guatemala, albeit not in a Spanish version, and without mailing by the clerk of the court, substantial compliance has been achieved"].)

There was some initial disagreement whether a natural person could ever be considered an "agent or instrumentality of a foreign state" within the

---

[2]For "agencies or instrumentalities of foreign states" service is proper if made under a special arrangement for service, on an agent for service of process, through the Hague Service Convention or "if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

"(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

"(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

"(C) as directed by order of the court consistent with the law of the place where service is to be made." (28 U.S.C. § 1608(b)(3).)

meaning of the FSIA given its statutory definition and legislative history.[3] (See, e.g., *Republic of Philippines* v. *Marcos* (N.D. Cal. 1987) 665 F.Supp. 793, 797 ["The terminology of [28 U.S.C. § 1603(b))]—'agency,' 'instrumentality,' 'entity,' 'organ'—makes it clear that the statute is not intended to apply to natural persons"].)

However, the weight of authority now recognizes an individual can qualify as an "agent or instrumentality of a foreign state" if he or she is an official of the foreign state and is sued in his or her official capacity.[4] (*In re Estate of Ferdinand Marcos, Human Rights Lit., supra*, 25 F.3d at p. 1470, fn. 2; *Chuidian* v. *Philippine Nat. Bank* (9th Cir. 1990) 912 F.2d 1095, 1103; *Kline* v. *Kaneko* (S.D.N.Y. 1988) 685 F.Supp. 386, 389 ["The FSIA does apply to individual defendants when they are sued in their official capacity"]; *American Bonded Warehouse Corp.* v. *Air France* (N.D.Ill. 1987) 653 F.Supp. 861, 863 ["Defendants Francois Bachelet and Joe Miller, sued in their respective capacities as employees of Air France [an instrumentality of the government of France], are also protected by the FSIA"].)

In the majority of cases the immunity rather than the status of the defendants as "foreign states" is in dispute. In those instances a claim of sovereign immunity is an affirmative defense which must be specially pleaded. In other words, the burden is on the foreign state to produce evidence in support of its claim of immunity. "Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state—that is, an act not within the exceptions in United States Code sections 1605-1607. Once the foreign state

---

[3]The legislative history of 28 United States Code section 1603(b) defining "agency or instrumentality" reads in part: "The first criterion [28 U.S.C. § 1603(b)(1)] . . . is intended to include a corporation, association, foundation or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name . . . . [¶] The second criterion [(28 U.S.C. § 1603(b)(2))] requires that the entity be either an organ of a foreign state . . . , or that a majority of the entity's shares or other ownership interest be owned by a foreign state . . . . [¶] . . . [¶] As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry . . . ." (H.R. No. 94-1487, Pub.L. No. 94-583, 94th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. & Admin. News, p. 6614.)

[4]In *Straub* v. *A P Green, Inc., supra*, 38 F.3d 448 the Ninth Circuit held the FSIA is also applicable to an entity which becomes a "foreign state" by the time the lawsuit is filed even though it was not a "foreign state" at the time of the alleged wrongdoing. In *Straub* the defendant corporation was fully owned by Societe Nationale de L'Aminate, a Crown Corporation of the Quebec Province, by the time the plaintiff filed his lawsuit. Thus it was an "instrumentality of the foreign state" and service of process had to comply with the requirements of the FSIA. (*Id.* at p. 451.)

has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state." (H.R. Rep. No. 94-1487, Pub.L. No. 94-583, 94th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. & Admin. News, p. 6616; accord, *Kline* v. *Kaneko, supra,* 685 F.Supp. at p. 389 [the ultimate burden of proof remains at all times with defendants].)

■ Similarly, when a plaintiff's complaint alleges claims based on strictly commercial activity (or another of the exceptions to immunity under the FSIA), the defendant must establish a prima facie case it is a "foreign state." In this case the record evidence is insufficient to establish any of the petitioners qualified as a "foreign state" for purposes of service of process under the FSIA. Princes Jefri and Hakeem assert they should be deemed "political subdivisions of a foreign state" by virtue of their status as family members of the Sultan of Brunei Darussalam.[5] Their suggestion of this status

---

[5]In support of his argument Prince Jefri relies on an unpublished federal district court opinion in which he claims the court expressly found him to be a "political subdivision of a foreign state." (*Marketic* v. *Kaliber Talent Consultants* (U.S. Dist. Ct. (C.D.Cal.), 1998, No. CV 97-0356 CBM). We believe Prince Jefri misconstrues the holding and significance of the *Marketic* court's order.

In *Marketic*, a former Miss America sued the Sultan of Brunei Darussalam, Prince Jefri, a talent agency and others seeking damages for alleged kidnapping and other torts based on sexual predation after she was recruited to become part of the harem in Brunei. Marketic alleged she was led to believe she was hired to perform legitimate promotional and spokes-model work.

The court dismissed the Sultan of Brunei from the action when the State Department issued a "suggestion of immunity" letter to the court. Prince Jefri moved to dismiss the action against him, claiming diplomatic immunity, head of state immunity and immunity as an "agency or instrumentality of a foreign state" under the FSIA. At the time, Prince Jefri held the position of finance minister of the Brunei Darussalam government. In its unpublished order denying Prince Jefri's motion to quash, the district court concluded Prince Jefri qualified as an "agent or instrumentality of a foreign state," but permitted the plaintiff to conduct additional discovery to determine whether the "commercial activity" exception to immunity should apply in that case.

In making her findings, Judge Consuelo Marshall analyzed the elements of 28 United States Code section 1603(b) defining an "agent or instrumentality of a foreign state." (See definition *ante,* pp. 993-994.]) She did not discuss the relevant legal characteristics of "political subdivisions" of foreign states. Specifically, Judge Marshall's order stated: "Here, defendant is a legal person, he is not a citizen of the United States nor was his title created by the laws of a third country, and as a prince in a monarchy, Defendant is a political subdivision. (Certified Letter From Permanent Secretary of the Minister of Foreign Affairs of Brunei Darussalam dated March 27, 1997, filed April 1997 [stating only that Prince Jefri was at the time of the *Marketic* complaint the Minister of Finance of Brunei Darussalam and a holder of a diplomatic passport].) Hence, this Court finds that Defendant *qualified as an instrumentality of a foreign state* under the Act." (Italics added.)

Thus, although the court mentioned the phrase "political subdivision" in its order, the analysis the court actually applied pertained to "agents or instrumentalities of a foreign state"

is certainly plausible. However, Princes Jefri and Hakeem present no evidence from which such an inference can be drawn. Under the Brunei Constitution they hold no government position or power by birthright. No official of the Brunei government presented an affidavit attesting to their recognition as officials of the government, or as potential heads of state, by virtue of their familial relationship to the sultan. Nor is there evidence the executive branch of the United States government recognizes the Sultan of Brunei Darussalam's siblings and their offspring as enjoying head of state status by virtue of their family relationship. (Cf. *Kline* v. *Kaneko, supra,* 685 F.Supp. at p. 392 [the FSIA does not apply to wife of Mexico's president because she has no official role or duties within the Mexican government; but the head of state doctrine may apply instead].)[6]

Moreover, despite the volume of materials the parties presented to the court on the background, history and economic analysis of the country of Brunei Darussalam, none described a line of succession to the sultanate. Certainly none described a line of succession which includes siblings and children of siblings as heirs to the sultanate in the Brunei monarchy. Nor do Princes Jefri and Hakeem assert the Sultanate of Brunei Darussalam does not follow the historically typical pattern of vertical lines of succession common in monarchies or where head of state status passes to the head of state's own children rather than to siblings and in turn to their children. In short, there is nothing in this record to support Prince Jefri's and Prince Hakeem's suggestion they should be considered integral parts of the government of Brunei Darussalam simply because of their blood relationship to the sultan.

■ Nor does the record evidence support a finding any of petitioners can be considered "agents or instrumentalities of the foreign state." The record establishes none held any official position, at any level of government at any of the relevant times pertinent to this lawsuit. In 1996 Prince Jefri "was" the

---

which the court ultimately found, based on Prince Jefri's official status as finance minster of Brunei Darussalam.

This single, likely inadvertent, mention of "political subdivision" in Judge Marshall's order is weak support for Prince Jefri's position in the present case. Moreover, the federal district court's unpublished order—based on a different set of facts—is neither binding on this court nor determinative of the present matter. At best it represents one court's view from the perspective of a different set of factual circumstances. (Cf. *Doe* v. *Haji Jefri Bolkiah* (U.S Dist. Ct. (D.C. Hawaii) 1998, No. 97-01198 ACK) [refusing to follow Judge Marshall's conclusion of "foreign state" status for Prince Jefri because in *Marketic* the issue was neither disputed by the parties nor analyzed by Judge Marshall].)

[6]Only individuals whom the United States recognizes as legitimate heads of state qualify. The determination whether an individual qualifies as a head of state is the exclusive function of the executive branch, to which the court must defer. (See *Lafontant* v. *Aristide* (E.D.N.Y. 1994) 844 F.Supp. 128, 131-134; *Flatow* v. *Islamic Republic of Iran, supra,* 999 F.Supp. at p. 24.) There has been no suggestion of immunity filed by the executive in this case. Therefore, we are not at liberty to consider Princes Jefri and Hakeem as such.

minister of finance of Brunei Darussalam. However, as counsel for Prince Jefri admitted at the hearing in this case, Prince Jefri no longer holds any official position in the Brunei Darussalam government. The absence of any contrary evidence in the record reinforces the presumed accuracy of counsel's statements.

With regard to Prince Hakeem, there is no claim or evidence he has ever held any official governmental position at any time in his lifetime.

On the other hand, Haji Junaidi has, on and off since 1982, held positions in the Brunei Darussalam government. According to his affidavit filed in the present matter, after graduating from college in 1982 he held the position of administrative officer in the department of medical and health. In 1983 he was reassigned to the position of private secretary to Prince Sufi, another brother of the Sultan of Brunei Darussalam. In 1994 he became deputy controller of customs and excise, royal customs and excise of the government of Brunei Darussalam. However, from June 1996 to the present he has been the "Principal Assistant" to Prince Hakeem.

Haji Junaidi's recitation of his career positions leads to the necessary inference he was not an official in the Brunei Darussalam government during the events in this case and is not now.

Moreover, Bijan's complaint does not make a claim regarding any alleged official acts committed by petitioners. Nor does the complaint purport to sue any of the petitioners in any official capacity. Instead the allegations of the complaint concern acts committed by individuals in their personal dealings with Bijan. Tellingly petitioners point to no authority to support the view the FSIA applies to individuals who are not government officials and who are not sued in their official capacities. Additionally, petitioners have neither shown nor argued the Government of Brunei Darussalam authorized them to enter the contracts at issue in this case.

Based on the state of the record evidence we conclude the trial court was correct in finding the FSIA did not apply to this case.

II. *The Trial Court Did Not Abuse Its Discretion in Finding Service of Process Valid Under California Law Thus Giving the Court Jurisdiction.*

Even assuming the FSIA is inapplicable to them petitioners argue the trial court nevertheless erred in failing to grant their motion to quash due to defective and therefore invalid service of process under California law.

As noted, in July 1998 Bijan mailed copies of the summons and complaint to 13 different office and residence locations in Brunei, England, and

Beverly Hills in an attempt to serve petitioners. In August 1998 Bijan again sent copies of the summons and complaint to the same 13 locations via Federal Express. Including the mailings to the corporate defendants, Bijan mailed more than 40 copies of the summons and complaint to petitioners, the majority of which were sent "in care of" various corporate entities allegedly wholly owned by petitioners.

Bijan did not receive a single signed return receipt from these mailings. On the other hand, the mailings did provoke correspondence from attorneys previously retained by petitioners for other matters. Solicitor Julian James in London, England wrote to advise Bijan he was not authorized to accept service of legal process for any of the named defendants. Bijan also received a letter from local counsel requesting he make no further effort to contact Micha Raines or the petitioners at the Silvercrest, Inc., address in Beverly Hills.

Next Bijan attempted to have Prince Jefri personally served with the summons and complaint at his apartments at the Plaza Hotel in New York. Despite 72 hours of surveillance and various attempts at personal service by three different persons, all attempts to personally contact Prince Jefri were thwarted by hotel personnel and the Prince's personal security staff. Ultimately the process server "made" substituted service on the security supervisor of the hotel.

Finally Bijan attempted service by publication in both the New York Post and the Los Angeles Times.

Petitioners point out all these attempts resulted in invalid service which deprived the trial court of personal jurisdiction over them. They claim service by mail out-of-state under Code of Civil Procedure section 415.40 was ineffective because Bijan cannot prove actual receipt through signed receipts. (Code Civ. Proc., § 417.20, subd. (a).) They also argue Bijan's attempt at substituted personal service under Code of Civil Procedure section 415.20 failed for lack of proof Prince Jefri actually used the Plaza Hotel in New York as his personal residence or abode. (*Zirbes* v. *Stratton* (1986) 187 Cal.App.3d 1407, 1416 [232 Cal.Rptr. 653] [substituted personal service at the defendant's parents' home was ineffective because the defendant did not reside at that location].)

Finally, petitioners claim service by publication (Code Civ. Proc., § 415.50) was similarly ineffective because the publications could not run their necessary course because they were interrupted when the corporate defendants removed the matter to federal court. (Citing *Richards* v. *Harper*

(9th Cir. 1988) 864 F.2d 85, 87 [service not completed before removal is void]; *Beecher* v. *Wallace* (9th Cir. 1967) 381 F.2d 372, 373, 9 A.L.R.Fed 861 [unserved state court process becomes null and void on date the action was removed to federal court].)

■ " ' " " 'An appellate court will not disturb the implied findings of fact made by a trial court in support of an order, any more than it will interfere with express findings upon which a final judgment is predicated. . . . In the consideration of an order made on affidavits involving the decision of a question of fact, the appellate court is bound by the same rule as where oral testimony is presented for review.' . . . When an issue is tried on affidavits, the rule on appeal is that those affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom, and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed." ' " (*Taylor-Rush* v. *Multitech Corp., supra,* 217 Cal.App.3d at pp. 109-110, citations omitted.)

■ We need not reach the issues whether substituted personal service on Prince Jefri or service by publication on all petitioners was effective to give the court personal jurisdiction over petitioners because we conclude the record amply supports the trial court's finding each petitioner was served at the addresses used by them for corresponding with Bijan during their course of dealing.

We agree with petitioners strict compliance with service requirements is required under California law. (*Lee* v. *Placer Title Co.* (1994) 28 Cal.App.4th 503, 509 [33 Cal.Rptr.2d 572] ["Successful service by mail requires strict compliance with all statutory requirements"]; see also *Dobrick* v. *Hathaway* (1984) 160 Cal.App.3d 913, 921 [207 Cal.Rptr. 50].) However, it appears such compliance was achieved in this case. "A summons may be served on a person outside this state in any manner provided by this article or by sending a copy of the summons and of the complaint to the person to be served by first-class mail, postage prepaid, requiring a return receipt. Service of a summons by this form of mail is deemed complete on the 10th day after such mailing." (Code Civ. Proc., § 415.40.)

Effective service on a defendant within California requires a signed receipt of the summons and complaint. (Code Civ. Proc., § 415.30, subd. (c).) By contrast, with service by mail on a defendant outside the state, no executed acknowledgment of receipt is required. (See *Johnson & Johnson* v. *Superior Court* (1985) 38 Cal.3d 243, 254-255 [211 Cal.Rptr. 517, 695 P.2d 1058]; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 933, p. 1113.)

Proof of service by mail on out-of-state defendants must nevertheless strictly comply with the requirements of Code of Civil Procedure section 417.20, subdivision (a). (See *Stamps* v. *Superior Court* (1971) 14 Cal.App.3d 108, 110 [92 Cal.Rptr. 151] [return receipt marked "unclaimed" will not suffice as a valid proof of service]; 3 Witkin, Cal. Procedure, *supra*, Actions, § 986, p. 1154.) This section provides if service is made by mail on an out-of-state defendant "proof of service shall include evidence satisfactory to the court establishing actual delivery to the person to be served, by a signed return receipt *or other evidence*." (Code Civ. Proc., § 417.20, subd. (a), italics added.)

Here the court detailed the "other evidence" on which it based its finding of "actual delivery": Bijan served petitioners at the addresses on the correspondence sent by petitioners themselves or their agents a minimum of two times each. During their dealings petitioners sent correspondence to Bijan on Amedeo Corporation letterhead as well as on Silvercrest, Inc., letterhead. Bijan regularly exchanged correspondence with Haji Junaidi at his Negara, Brunei address. Moreover, Bijan had been specifically directed to use the Silvercrest, Inc., address to ensure correspondence and merchandise would reach petitioners. The record evidence establishes petitioners could in fact be reached at, or in fact received correspondence or parcels directed through, these various addresses. This was sufficient "other evidence" to assure the trial court petitioners had received "actual delivery" of the summons and complaint within the meaning of Code of Civil Procedure section 417.20, subdivision (a).

### DISPOSITION

The petition for writ of mandate is denied. The order to show cause is discharged. Real parties in interest to recover their costs of this proceeding.

Lillie, P. J., and Neal, J., concurred.

Petitioners' application for review by the Supreme Court was denied December 15, 1999.