[No. H033266. Sixth Dist. Nov. 24, 2009.]

STANDARD MICROSYSTEMS CORPORATION, Plaintiff and Respondent, v.
WINBOND ELECTRONICS CORPORATION et al., Defendants and Appellants.

**COUNSEL**

Reed Smith, Paul D. Fogel, Raymond A. Cardozo; Finnegan, Henderson, Farabow, Garrett & Dunner, Robert F. McCauley, Steven H. Morrissett, Elisabeth J. Barek and Wendy A. Herby for Defendants and Appellants.

Dechert and Chris Scott Graham for Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—Plaintiff Standard Microsystems Corporation brought this action accusing a Taiwanese corporation and an Israeli corporation of misappropriating the design of a microchip used in manufacturing personal computers. Both defendants were advised by their California attorney that the attempt to serve them by mail was ineffective, and that they were under no obligation to answer the complaint. When plaintiff took their default, the same attorney sought relief on the ground that service was void, or that defendants themselves were guilty of mistake, surprise, inadvertence, or excusable neglect in believing it to be void. The trial court found that the defaults were the result of a calculated strategy resting on a mistake of law, which did not constitute excusable neglect. It denied relief and entered a default judgment. Defendants then engaged new counsel, who moved for relief from the default judgment, as well as the underlying default, on the ground that both were the result of the fault of defendants' first attorney—an assertion that, if borne out, would ordinarily entitle them to *mandatory* relief under Code of Civil Procedure section 473, subdivision (b) (section 473(b)). The trial court again denied relief. We hold that this was error because the undisputed facts plainly established the attorney fault necessary to trigger a right to mandatory relief. We also reject plaintiff's argument that relief was barred by Code of Civil Procedure section 1008 (section 1008), which restricts motions for reconsideration and renewals of previously denied motions. Although the later motion may have been, in part, a renewal of the first motion within the terms of section 1008, the relief that made it so was ancillary to, and necessary to effectuate, the greater object of the second motion, which neither sought reconsideration nor the issuance of an order the court had previously declined to grant. Further, to the extent a literal application of section 1008 might conflict with the provisions of section 473(b), the latter must prevail. Accordingly, we will reverse the judgment.

## BACKGROUND

### A. *Complaint, Service, Default*

Plaintiff Standard Microsystems Corporation (Standard or SMSC) and defendant Winbond Electronics Corporation (WEC) market competing microchips of a type known as a "Super I/O" or SIO, which provides multiple functions in a personal computer, such as power management and controlling ports and input devices. Prior to summer 2007, plaintiff sold SIO's to Hewlett-Packard Company (HP), a manufacturer of personal computers, for at least one of the latter's product lines. In 2007, HP decided to purchase SIO's for the coming model year from WEC instead.

On November 20, 2007, plaintiff initiated this action with a complaint alleging that the SIO developed and sold by WEC and a related corporation, defendant Winbond Israel, Ltd. (WIL), was a "clone" that "provide[d] the functionality" of the chip plaintiff had previously developed for HP.[1] In developing and manufacturing it, plaintiff alleged, defendants had used trade secrets belonging to, and wrongfully acquired from, plaintiff. It prayed for compensatory damages, disgorgement of sums by which defendants were unjustly enriched, imposition of a constructive trust on trade secrets in their possession, and injunctive relief.

On November 24, 2007, plaintiff's attorney mailed copies of the summons and complaint to both defendants, by registered mail, return receipt requested, addressed to their respective headquarters in Taiwan and Israel. A WEC manager later declared that the papers were received at its Taiwan offices on November 24.[2] Those mailed to WIL apparently reached its offices on December 13, 2007.

It is not effectively disputed that within 10 days of receiving the summons and complaint, T.Y. Huh, the head of WEC's legal division, began communicating about the matter with Yitai Hu, then a partner with the firm of Akin Gump, who already represented WEC in another matter. Hu believed that the service by mail had not been effective to confer jurisdiction over either defendant. He later acknowledged advising them, on that basis, that "that they were not required to answer the complaint under U.S. law." Hu did not advise defendants of the possibility of moving to quash service, which would have shielded them against a default. (See Code Civ. Proc., §§ 418.10, subd. (a)(1), 585, subd. (a), 586, subd. (a)(4); see *id.*, § 412.20, subd. (a)(3).)

On December 13, SMSC mailed requests for production of documents to both defendants. Huh later declared that he remained "concerned about Winbond's obligation to respond to the complaint," and therefore asked Hu, on or around December 19, 2007, "to double-confirm whether the service of SMSC's complaint was effective or not and reminded him that Winbond must answer by December 29 if the service was valid.[3] Mr. Hu confirmed his

---

[1] HP was not identified in the complaint but was later acknowledged to be the "customer" referred to there.

[2] That the papers were received on the same day they were mailed is virtually impossible, particularly in view of the international date line, which would have allowed a maximum *theoretical* time of *eight hours* for the papers to enter the mail, cross the Pacific, and be delivered. Another calendar-related discrepancy in the proofs suggests that the actual date of receipt may have been November 29. (See fn. 3, *post.*)

[3] In fact, the statute under which service was made declares it not effective until the 10th day after mailing. (Code Civ. Proc., § 415.40.) The papers were mailed on November 24, 2007, making service effective as of December 4, 2007. The 30-day time to respond would thus run

previous advice, that neither WEC nor [WIL] had been validly served and that we need do nothing. He warned us that SMSC would take the opposite position to lure Winbond into appearing early." Huh asked Hu "to provide a strategy for resolving this case at an early stage, if possible," and on December 20, Hu "recommended that we authorize him to contact with [*sic*] SMSC's legal counsel for the purpose of agreeing on a date for Winbond to answer SMSC's complaint so that we could move the case forward."

Pursuant to this strategy, on the next day Hu's associate, Elizabeth Rader, contacted SMSC's attorney, Chris Scott Graham, by phone, indicating that she "wanted to work out a time for Winbond to respond." Graham responded by e-mail on December 23, 2007, saying that he would be traveling for the following week but that upon his return, and upon receiving confirmation of her authority to represent defendants, he would call her when his schedule allowed. She wrote him on January 3, 2008, confirming that her firm had been "formally authorized and instructed" by defendants "to speak with SMSC's counsel about the attempted service of the complaint and other discovery-related documents." She continued, "We do not believe SMSC's attempted service on either [defendant] was effective. We would like to reach an agreement on a date that [defendants] would answer or otherwise respond to SMSC's complaint."

Graham and Rader spoke by telephone on January 4, 2008. In a letter memorializing the conversation, Graham wrote that he believed the deadline for responding to the complaint had already passed, but that "as a professional courtesy and in light of your representation that the Winbond entities will not challenge jurisdiction or service, at this time [Standard] agrees to extend to January 11, 2008, the time in which the Winbond entities may file either an answer or demurrer." He expressed a willingness to discuss settlement, but "because of the time sensitive nature of the business in which these devices are used and reflective of the desire of [Standard] to address this situation expeditiously, at this time Winbond must respond to the formal discovery already served consistent with the requirements of the Code of Civil Procedure."

Rader later declared that in this conversation she and Graham had disagreed over the effectiveness of the attempted service on defendants. Graham told her, however, "that he was not inclined to seek default, because Winbond was offering to respond. I told Mr. Graham that Winbond would be willing to

---

on Thursday, January 3, 2008. (See Code Civ. Proc., § 412.20, subd. (a)(6).) The suggestion of a December 29 due date may reflect 30 days from November *29* (see fn. 2, *ante*), with no adjustment for mailing.

voluntarily accept service, if SMSC provided a longer extension of time to respond to the Complaint. Mr. Graham told me that he could offer at the very least a one-week extension, and would discuss a longer extension with SMSC."

On January 11, Rader wrote to Graham alluding to the parties' disagreement "about whether [Standard's] attempted service by mail was effective." She expressed appreciation for his "professional courtesy in granting us a purported extension of time to respond until January 11, 2008," but asserted that since "service was ineffective," defendants' "time to respond ha[d] not even begun," nor was any response to Standard's discovery requests "legally required." She described defendants' earlier offer as one to "voluntarily accept service of process and agree to answer or demur in exchange for a significant additional time to respond." She indicated that the extension "should be long enough to allow the parties to try to resolve this matter without litigation." She asserted that Graham had agreed, in their earlier conversation, to "take that proposal back to SMSC and seek their agreement." She reiterated defendants' offer to voluntarily appear and defend, but conditioned it on an extension of "at least one month from today." She expressed a willingness to engage in informal discovery, impliedly in connection with such an extension.

Graham later declared that on January 14, 2008, he told Rader that Standard would request entry of default as to both defendants unless they agreed to respond to the complaint and the outstanding discovery by February 11, waiving any jurisdictional objections. He told her that in the absence of a response to this proposal by January 16, 2008, Standard would seek defaults on January 18.

On January 17, Graham e-mailed Rader that he had heard nothing since their January 14 conversation, and that Standard was therefore left with "no option but to move forward to have default entered against Winbond. Since [her firm had] not formally entered an appearance, no further notification of these proceedings will be sent to your attention. Rather, we will continue to follow the procedures specified in the Code of Civil Procedure and deal with Winbond directly."

On January 22, 2008, acting pursuant to an ex parte order of that date finding proper service on both defendants, the clerk entered their defaults.

B. *Motion for Relief from Default*

On January 24, Akin Gump filed a notice of appearance stating that it had been "retained by defendants . . . to represent them in this action," while

reserving to defendants any jurisdictional challenge they might have. In a cover letter transmitting this filing to Graham, Rader asked him to withdraw his request for default and wrote further, "Although we are unable to agree to respond to your discovery requests by the early February deadline that you proposed, we are willing to work something out to reach a resolution in this matter. We are prepared to move to set aside default and quash service. Winbond would prefer, however, to resolve this action quickly." The record does not contain a reply.

On February 8 and 11, 2008, respectively, WIL and WEC filed separate motions to set aside the default and quash service of process.[4] Although both notices of motion cited section 473(b), the only coherent legal argument offered by either was that service had been defective. That is, the argument was coherent as to WIL, which argued that the service on it "failed to comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ('Hague Service Convention') in serving the summons and complaint . . . ." The gist of the supporting argument was that the Hague Service Convention (Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638), to which Israel is a signatory, does not contemplate the service of *process*, as distinct from other materials, by mail. WIL acknowledged that one California decision had held otherwise, but dismissed that case as "not determinative" in view of contrary authority. In doing so it either overlooked or ignored the fact that the cited decision, *Denlinger v. Chinadotcom Corp.* (2003) 110 Cal.App.4th 1396, 1399–1400 [2 Cal.Rptr.3d 530], came out of this court, which would have appellate jurisdiction over any ruling the trial court might make. Nor did it acknowledge that we had, in that decision, pointedly examined conflicting authorities and concluded that the "the better, and more modern, view" is that in the absence of specific objection by the adhering country, the convention allows service by mail. (*Id.* at pp. 1400–1405.) Instead defendants countered with a case decided shortly after *Denlinger* that, without citing it, acknowledged the conflicting lines of authority and *declined to decide* which to follow since the service there was defective under California law. (*In re Alyssa F.* (2003) 112 Cal.App.4th 846, 853 [6 Cal.Rptr.3d 1].)

WEC's jurisdictional challenge was, if anything, weaker than WIL's. It acknowledged that the Hague Service Convention did not apply to service in Taiwan, but argued that the attempted service on it was nonetheless defective because it was not accomplished in the manner "prescribed by Taiwanese law,

---

[4] Although defendants moved separately, they later filed a joint reply memorandum, and all participants treated the two motions as one for nearly all purposes. For convenience, and particularly when distinguishing them from the later motion to vacate the judgment, we will often refer to these motions collectively as "the first motion," or equivalent.

namely, letters rogatory or judicial assistance by Taiwanese courts." "Because service was defective under Taiwanese law," it contended, "any judgment in the action is *unenforceable in Taiwan*." (Italics added.)

Both defendants also suggested that they had acted reasonably in the events leading to the default. WIL asserted that it had made good faith efforts to negotiate its entry into the action. WEC asserted that it had reacted to the complaint reasonably, diligently, and promptly; that its efforts to participate in the litigation were "hampered by the process of retaining U. S. counsel and a belief that negotiations were ongoing"; that the law strongly favors resolution of cases on their merits; and that Standard would suffer no prejudice from granting relief. It also argued that relief was justified by its "reasonable belief that service was defective," a belief Huh declared he had held. There was no suggestion that his belief was shared by, let alone that it originated with, defendants' attorney, Hu; nor did either motion otherwise suggest that the default was the product of neglect or mistake by counsel.

In opposition to the motions for relief, plaintiff argued that service on both defendants complied with California law and that the Hague Service Convention did not invalidate it as to either. In the case of WEC, it did not apply at all, because Taiwan was not a signatory to the treaty. In the case of WIL, plaintiff contended that service by mail was effective under this court's holding in *Denlinger v. Chinadotcom Corp., supra*, 110 Cal.App.4th 1396. Plaintiff asserted that Israel has "affirmatively stated that it has no objection to this provision of the Hauge [*sic*] Convention." Plaintiff further argued that defendants' defaults were the product of "willful failure to respond rather than any 'mistake, inadvertence, surprise or excusable neglect.' " In a foot-note it observed, "As WEC neither based its Motion on attorney fault, nor filed the required attorney affidavit of fault, the 'mandatory' provision[s] of Section 473(b) do not apply."

At the first hearing on these motions, after an in camera discussion of "in limine requests," the court observed, "What it comes down to in my mind is whether there's adequate room under 473 to grant your request, and unfortu-nately when I review the correspondence that's gone on between the two of you, I see this not as an active mistake, inadvertence, surprise, excusable neglect, but in fact a calculated maneuver on behalf of Winbond to delay this matter. [¶] I say that I'm not—I don't really like to take sides because I know this was very strenuously argued in my chambers, but when I've read—and I didn't know all the facts of the case when I read the—when I had you in my chambers because those are very short sessions, but at this time having read all the correspondence and e-mail between the two counsel, I'm led to believe that this was a calculation on the part of Winbond and not anywhere close to mistake, inadvertence, surprise or excusable neglect."

However the court did not rule at that time, but apparently allowed further time for defendants to submit additional briefing, which they did in the form of a joint reply memorandum. Here they directly asserted for the first time that if the service on them had not been defective, then they were entitled to relief under section 473(b) because the defaults were the result of their mistake, surprise, or excusable neglect in supposing service to have been defective. In a supplemental declaration, Huh averred that WEC's "general practice" when named as a defendant was to "fully defend any such action," but to deal with questions of jurisdiction by "negotiat[ing] a date to answer or otherwise respond to the complaint . . . . To the best of my knowledge, Winbond has negotiated due dates for its responsive pleadings in each of the cases in which Winbond has been a defendant in state and federal courts, and has, in each instance, answered each such complaint." Defendants argued, "If the court finds that service on Winbond was proper, then Winbond's belief that the service was improper was a reasonable mistake of law." Again no mention was made of the fact, as later appeared, that Hu had told defendants the service was defective, that they had no obligation to respond to it, and that they should not do so.

On April 15, 2008, the court issued a formal order denying both motions. It found that both defendants had "received valid service," and continued, "There is no factual support for defendants' assertion that default was entered due to mistake, inadvertence, surprise or excusable neglect. The court does not find credible defendants' assertion that they lacked familiarity with court procedures. 'Absent an "attorney affidavit of fault," an attorney's mistake of law is charged to the client, and mere ignorance of the law or negligence in conducting legal research is not excusable neglect.' (Weil & Brown, Cal. Prac. Guide: Civ. Pro. Before Trial (The Rutter Group 2007) ¶ 5:313, p. 5-84, citing *Anderson v. Sherman* (1981) 125 Cal.App.3d 228, 237–238 [178 Cal.Rptr. 38].) Defendants' mistaken belief that service was improper does not amount to excusable neglect or a mistake of law which would justify relief in this instance. If defendants believed service to be improper, defendants could have filed a motion to quash. The evidence reflects defense counsel's attempt to negotiate a lengthy extension of time to respond. The court notes that any stipulation to extend the time to respond by more than 15 days requires a court order. (See California Rules of Court, rule 3.110, subds. (d) and (e).) While attempting to settle this litigation is laudable, defendants had an obligation to file a responsive pleading or affirmatively seek the appropriate relief from this court. Defendants' counsel received adequate warning of plaintiff's intent to seek default. The default shall not be set aside pursuant to Code of Civil Procedure section 473, subdivision (b)."

After a prove-up hearing on May 9, 2008, the court entered judgment in the form requested by plaintiff's counsel, which included imposition of a constructive trust and an injunction restraining defendants "and those in

active concert or participation" with them from "possessing, obtaining, transferring, disclosing or using in any way or form any of the SMSC Trade Secrets including, but not limited to, in the form of the Winbond Super I/O and/or any other device or product developed through and/or with the use of any of the SMSC trade secrets." It permitted Winbond to continue to "provide the Winbond Super I/O to Hewlett Packard Company," but "only for [a] Restricted Purpose" as there set out. This was, inferentially, an accommodation to HP, whose motion to intervene in the action had been taken off calendar on the day of the second hearing on defendants' motions.

### C. *Motion to Vacate Judgment*

On May 20, 2008, after consulting with representatives of the firm of Finnegan, Henderson, Farabow, Garrett & Dunner, defendants engaged Steven Morrissett of that firm to represent them. On June 19, he filed a motion on defendants' behalf seeking "mandatory relief from entry of default and default judgment or, in the alternative, discretionary relief from entry of default and default judgment." The central contention in support of the motion was that defendants' original attorneys had "failed to provide the proper advice and take the proper actions once default became a palpable threat."

The motion was accompanied by a declaration from Attorney Hu in which he stated that at the time defendants' defaults were taken, he believed that neither had received proper service, and on that basis had told defendants "that they were not required to answer the complaint under U.S. law." He acknowledged that defendants were relying upon and following his advice in failing to respond to the complaint. He did not advise them to "file a motion to quash," or "otherwise respond to the complaint," before the entry of default. He acknowledged his responsibility, "as legal counsel for my clients, . . . for advising them to file a motion to set aside the default, and for preparing such a motion. When preparing the motion, I believed that the Court would set aside any default because of an invalid service of process. I did not include any argument showing that there was a 'mistake, inadvertence, surprise, or excusable neglect' in WEC and [WIL]'s motions." Perhaps most curiously, he averred that he had also acted in reliance on an expectation that he would "receive notice of any application for entry of default before default was entered so that we could respond."

A further declaration was submitted from Huh, who said among other things that Winbond had engaged Attorney Hu because he and his then firm, Akin Gump, "were already [Winbond's] counsel of record in an unrelated patent litigation in the U.S. District Court in Utah." Huh declared that defendants had "sought legal information and instructions" from retained

counsel "on the[ir] legal obligations . . . in responding to the complaint . . . . Based on legal advice we received, we believed that the service of process on WEC and [WIL] was improper and ineffective and that neither WEC nor [WIL] was obligated to answer the complaint. We further believed and expected that our retained U.S. attorney would advise us what actions were necessary and take any necessary steps to preserve Winbond's rights, since no one at [Winbond] had authority to appear or knew what to do in the California courts. [¶] . . . Not until January 15, 2008, did [Winbond] first learn that [Standard] was threatening default. However, at this same time we also believed that our retained U.S. attorneys had essentially negotiated the extension [Winbond] needed to fairly respond to the complaint and discovery requests. We were assured by our retained U.S. attorney, Mr. Hu, that the risk of [plaintiff] seeking or obtaining a default was minimal. We were never informed, nor were we aware, that there were procedures by which Winbond could challenge the service of process by filing a motion to quash service *before* [Standard] filed an application for entry of default and to test the sufficiency of the mail service in Taiwan and Israel without risking default. [¶] . . . [Winbond] did not learn that [Standard] had filed papers applying for entry of default until after the Clerk's default was already entered. [Winbond] received a copy of the application for entry of default, sent by regular mail, on January 28, 2008. I was informed that Winbond's attorneys would be moving to set aside the default. [¶] . . . On May 12, 2008, [Winbond] learned that a final default judgment had entered against it, including a permanent injunction." These averments were echoed in a declaration by WIL manager Mizrahi, who also stated that WIL had no legal staff of its own, that this was the first American action ever brought against it, and that its management had decided to coordinate its defense with that of WEC. Accordingly, "[WIL] did not manage the legal case, but relied on WEC and our U.S. counsel to protect [WIL]'s legal rights."

Standard filed an opposition memorandum in which it repeatedly characterized the motion to vacate as a "motion for reconsideration." It contended that because the motion did not comply with section 1008, the relief it sought was beyond the court's jurisdiction. It further contended that defendants had failed to establish that the defaults or default judgments were the product of attorney fault because the affidavit from Attorney Hu was not "straightforward" and constituted a "sham" that was "inconsistent with the facts presented" in connection with the earlier motions for relief.

In reply defendants advised the court of news stories indicating that as of July 29, 2008, a group of intellectual property partners headed by Hu was leaving Akin Gump for the firm of Alston & Bird. They also filed yet another declaration from Huh in which he attempted to dispel the swarm of aspersions plaintiff had cast upon defendants' showing in support of the motion. We need not recapitulate the declaration here except its elaboration on the

advice initially rendered by Hu: "When we asked for advice on how Winbond should respond to the complaint on December 4, 2007, Mr. Hu indicated that if the complaint was sent to [WEC] and [WIL] by the lawyers, it was not validly served, because it had to be served by the court. He advised that Winbond need not and should not respond to the complaint. . . . [H]e also promised to monitor the court filings to see if SMSC claimed to the Court that the service was proper. [¶] 11. On December 19, 2007, concerned about Winbond's obligation to respond to the complaint, I asked Mr. Hu to double-confirm whether the service of SMSC's complaint was effective or not . . . . Mr. Hu confirmed his previous advice, that neither [WEC] nor [WIL] had been validly served and that we need do nothing. He warned us that [Standard] would take the opposite position to lure Winbond into appearing early. [¶] . . . [¶] 16. We became very anxious on January 15, 2008, when Mr. Hu informed us that SMSC had threatened to take default. Mr. Hu again gave us assurances that caused us to believe he had matters under control. He led us to believe that SMSC would not or could not obtain a default and that this was a 'game' that some U.S. attorneys play to take unfair legal advantage of foreign companies. [¶] . . . [¶] 19. My statement in paragraph 9 of my declaration dated February 5, 2008, was drafted by Akin Gump, Winbond's U.S. counsel. My understanding of California law stated in that paragraph was based on what Mr. Hu told me in this case. It is not based on any knowledge that I have of U.S. or California law. It does not state any policy by Winbond not to answer complaints. In fact, Winbond's practice has been, when it learns of any U.S. complaint or claim is to retain competent U.S. legal counsel, to follow its counsel's advice, and to comply with the U.S. laws as informed by its U.S. counsel. In every other case in which [WEC] has been a party, to my knowledge it has always filed timely answers, often without service at all, through waiver of formal service of the summons and complaint to minimize costs and expedite the legal process."

Defendants also filed a reply declaration from Attorney Rader, who stated that throughout her involvement in the matter, "Yitai Hu was the partner in charge of representing Winbond . . . , and solely responsible for decisions made in the case." She had the understanding, based on e-mails between Hu and Winbond executives, that "Winbond had a very limited understanding of United States and California law and relied entirely on Mr. Hu to advise them how to respond to the Standard . . . complaint and to represent Winbond's rights in this matter." She also saw correspondence beginning in mid-December 2007 confirming that Hu had assured Huh, in response to the latter's expressions of concern, "that the complaint in *SMSC v. Winbond* was not properly served and that no response to the complaint was required."

At the hearing on the motion, the court opened the substantive exchange by addressing counsel for defendants as follows: "I stated in my earlier order in this matter how I felt that this was a knowing, I don't want to be too harsh in

the terms, that the Winbond defendants knew exactly what they were doing when they delayed this matter when the default was taken. And so I'm reluctant to revisit that issue. So let me just leave that—those comments for you to respond." After counsel had done so for a while, the court reiterated its concern that defendants' actions reflected a deliberate strategy of delay: "[T]hat sort of confirms the Court's concerns that there's been gamesmanship here, that's the problem when you bring the motion under the section which doesn't admit fault, and then when you lose that many, many months have passed and you bring a motion admitting attorney fault.[5] And it just, it smacks in the same attempt to delay and therefore gain advantage that the Court was concerned about, before to be totally honest with you." Counsel replied that former counsel "blew it in this case, in more ways than one" and that another of their lapses was failing to seek mandatory relief on the basis of their own fault in the original motion. He described their moving papers as reflecting "Akin Gump trying to cover up for its own errors and it's subjecting its client and having them twist in the wind. . . . [I]f there was any gamesmanship going on at that point, your Honor, it was by [Hu and his firm]. It wasn't by an unsuspecting client who didn't even know about the attorney affidavit of fault provision."[6]

When counsel sought to elicit questions from the court, the court observed somewhat perplexingly that its concerns were "more philosophical." After alluding to its earlier comments, it continued, "[Y]ou see, if you consider that [Hu's firm] was acting competently then the entire case falls into the interpretation that I've placed on it. So to say they've acted incompetently is somewhat difficult for the Court to accept. That's the philosophical leap that I have to make. And I understand your position, I understand it fully. But when well prepared counsel comes before this Court and argues, and I had [defense counsel] in my chambers on a couple of occasions, I don't recall whether they actually argued in court, but I felt that I was hearing very competent counsel represent [defendants], and it's difficult for me to make the philosophical jump you're asking me to make." Interpreting this to mean that the court was "hav[ing] a hard time believing that [defense counsel] committed malpractice," counsel observed that he did not share that difficulty. "I would

---

[5] In fact the motion was brought 11 days after the court entered judgment, and some 34 days after it denied defendants' first motion for relief from the default. It is readily gathered from the record that for much of this time defendants continued to rely on Hu to protect their interests. Hu in turn apparently still believed that service was defective.

[6] When defendants' attorney suggested that plaintiff's counsel was engaging in "character assassination" and "tortured misreading of the affidavits" by implicitly accusing defendants and their counsel of deceitfulness, the court instructed him to "stay on the positive side here." This may seem an odd instruction given that plaintiff's argument included widespread imputations of perjury or, at best, active attempts by defense counsel to mislead the court, which of course would constitute serious ethical violations.

never let my clients slip into default the way they did. I think it's inexcusable, quite honestly. And if the Court takes a look at the [*Solv-All v. Superior Court* (2005) 131 Cal.App.4th 1003, 1012 [32 Cal.Rptr.3d 202]] case again, towards the end the Court points out, [']that an attorney whose error or omission has led to a default has already established the imperfection of his judgment and/or legal act.' " The court replied that it had "some difficulty applying the *Solv-All* case to this situation because of the attempts that the plaintiffs made in this case to time and time again ask for a response from Winbond with regard to the settlement of this case, and the resolution of the case. And I think that may distinguish your situation from the *Solv-All* case."

On the next day, the court issued its order denying the motions for relief. After citing *Jerry's Shell v. Equilon Enterprises, LLC* (2005) 134 Cal.App.4th 1058 [36 Cal.Rptr.3d 637] (*Jerry's*), the court wrote, "The court finds that defendants' counsel engaged in [a] deliberate tactical decision not to file a responsive pleading. Like the court in *Jerry's*, this court also finds *Solv-All v. Superior Court*[, *supra*,] 131 Cal.App.4th 1003 to be distinguishable because there was no mistake about whether plaintiff expected a response even with settlement discussions underway. (*Jerry's, supra*, 134 Cal.App.4th at p. 1074.) As noted in this court's prior ruling, defendants' counsel received adequate warning of plaintiff's intent to seek default. [¶] Defendants Winbond Electronics Corporation and Winbond Israel Ltd.'s alternative motion for discretionary relief from entry of default and default judgment pursuant to Code of Civil Procedure section 473, subdivision (b) is DENIED as an improper motion for reconsideration. (Code Civ. Proc., § 1008.) 'The name of the motion is not controlling.' (See Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2008) ¶ 9:324.1, p. 9(1)-118 citing *Curtin v. Koskey* (1991) 231 Cal.App.3d 873, 878 [282 Cal.Rptr. 706].)"

Defendants filed an appeal from this order and from the judgment.

### DISCUSSION

I. *Section 1008 Did Not Render the Motion to Vacate the Judgment Invalid*

 A. *Introduction*

Plaintiff contends that because both defendants had already sought unsuccessfully to set aside the clerk's entry of default, their motion to vacate the judgment and the default on grounds of attorney neglect sought "reconsideration" of the former order and was subject to the constraints of section 1008. Because the motion to vacate did not conform to that statute, the argument continues, it was not "valid" so as to extend defendants' time to appeal from

the judgment under California Rules of Court, rule 8.108(c). Because defendants' notice of appeal was filed more than 60 days after notice of entry of the judgment, plaintiff concludes, we lack jurisdiction over the appeal. (See *id.*, rule 8.104(a)(2).)

Plaintiff filed a separate motion to dismiss on this ground. Anticipating its probable denial, but wishing to study the question more closely, we deferred the motion for consideration with the merits. If the argument were well taken, it would of course require dismissal of the appeal without reaching the merits. We therefore address it first.

■ Section 1008 represents the Legislature's attempt to regulate what the Supreme Court has referred to as "repetitive motions." (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1103 et seq. [29 Cal.Rptr.3d 249, 112 P.3d 636].) The breadth of this coinage—which might be used to describe any motion calling upon a court to revisit some question it has already addressed—provides a useful contrast to section 1008 itself, which does not by its terms purport to govern all repetitive motions but instead describes itself as circumscribing the trial courts' "jurisdiction" over "applications to *reconsider any order* of a judge or court," and applications "for the *renewal of a previous motion.*" (§ 1008, subd. (e), italics added.) It thus creates two distinct subclasses of repetitive motions: applications (motions) for reconsideration, and renewals of previous motions. Motions for reconsideration are regulated by section 1008, subdivision (a) (section 1008(a)), which requires that any such motion be (1) filed "within 10 days after service upon the party of written notice of entry of the order" of which reconsideration is sought, (2) supported by new or additional facts, circumstances or law, and (3) accompanied by an affidavit detailing the circumstances of the first motion and the respects in which the new motion differs from it. (*Ibid.*) Renewed motions are governed by section 1008, subdivision (b) (section 1008(b)), which echoes the latter two requirements, but *does not impose a time limit.*[7] (§ 1008(b).)

---

[7] Section 1008 provides in part: "(a) When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit *what application was made before, when and to what judge, what order or decisions* were made, and what new or different facts, circumstances, or law are claimed to be shown.

"(b) A party who originally made an application for an order which was refused in whole or part, or granted conditionally or on terms, may make a subsequent application for the same order upon new or different facts, circumstances, or law, in which case it shall be shown by affidavit what application was made before, when and to what judge, what order or decisions·

B. *The Penumbral Approach*

Perhaps the foremost of many curiosities surrounding section 1008 is that neither the Legislature in drafting the statute, nor most courts in applying it, seem to have squarely acknowledged—let alone addressed—the central definitional problem of what characteristics bring a motion within one of the two classes regulated by the statute. Remarkably few cases apply the statute's own language to the problem. Indeed a number of decisions have implicitly refused to do so, inferring instead a legislative desire that the statute be applied broadly to bar motions that may *not* fall within its terms. This approach appears to rest on the Legislature's declaration that the statute restricts the court's "jurisdiction" over motions governed by it. (§ 1008, subd. (e) (section 1008(e)); see fn. 7, *ante*.) Some courts have also referred to an uncodified declaration of intent, adopted with the 1992 amendments to the statute, expressing the Legislature's wish to "reduce the number of motions to reconsider and renewals of previous motions heard by judges in this state."[8] From these legislative pronouncements some courts have gathered that section 1008 must be applied to motions *not* within its terms.

■ A court's first job when applying a statute—and its only one in the absence of ambiguity or constitutional infirmity—is to give effect to the legislative will *as expressed in the statute*. The approach we have just described seems to overlook this fundamental principle in favor of a more *penumbral* approach to statutory text. The threat it poses to the separation of powers, as well as to sound and predictable procedure, is illustrated by what

---

were made, and what new or different facts, circumstances, or law are claimed to be shown. For a failure to comply with this subdivision, any order made on a subsequent application may be revoked or set aside on ex parte motion. [¶] . . . [¶]

"(e) This section specifies the court's jurisdiction with regard to applications for reconsideration of its orders and renewals of previous motions, and applies to all applications to reconsider any order of a judge or court, or for the renewal of a previous motion, whether the order deciding the previous matter or motion is interim or final. No application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section."

[8] "The Legislature finds and declares the following:

"(a) Since the enactment of Section 1008 of the Code of Civil Procedure, some California courts have found that the section does not apply to interim orders.

"(b) In enacting Section 4 of this act, it is the intent of the Legislature to clarify that no motions to reconsider any order made by a judge or a court, whether that order is interim or final, may be heard unless the motion is filed within 10 days after service of written notice of entry of the order, and unless based on new or different facts, circumstances, or law.

"(c) In enacting Section 4 of this act, it is the further intent of the Legislature to clarify that no renewal of a previous motion, whether the order deciding the previous motion is interim or final, may be heard unless the motion is based on new or different facts, circumstances, or law.

"(d) Inclusion of interim orders within the application of Section 1008 is desirable in order to reduce the number of motions to reconsider and renewals of previous motions heard by judges in this state." (Stats. 1992, ch. 460, § 1, p. 1831.)

seems to be the original example of the approach, *Morite of California v. Superior Court (Grayson)* (1993) 19 Cal.App.4th 485 [23 Cal.Rptr.2d 666] (*Morite*).[9] The court there read section 1008 to prevent a judge, to whom a case had been assigned for eventual trial, from *setting a trial date* in the face of an order by another judge *staying the action* pending determination of a related suit. (*Morite, supra,* 19 Cal.App.4th at p. 487.) The court made no attempt to apply the statutory language to the situation before it, and acknowledged that if "reconsideration" had been sought at all, it was only "by implication." (*Id.* at p. 492.) However, the court wrote, "logic dictates the following argument: if courts may simply ignore interim orders instead of modifying, amending or revoking them after due consideration, *then the procedural, substantive and jurisdictional requirements of section 1008 are meaningless.* By making section 1008 expressly jurisdictional, the Legislature clearly intended to prevent courts from modifying, amending or revoking prior orders without due reconsideration. Ignoring (i.e., implicitly revoking) interim orders, such as the prior stay order, *undermines the legislative intent* behind section 1008, subdivision (e)." (*Id.* at pp. 492–493, italics added.)

■ None of these assertions can survive scrutiny. First, permitting *courts* to "ignore" previous orders does not render the statute meaningless, or indeed have any effect on its stated purpose, which is to exclusively regulate *motions* to reconsider prior orders, and renewed, previously denied *motions*. As the Legislature chose to express itself, it did not "clearly intend" to have *any* effect on the *court's* power to disregard, diverge from, abrogate, or otherwise render nugatory its previous orders.[10] Therefore the order there—insofar as it

---

[9] *Morite*'s influence continues to echo down the corridors of precedent even though it has been thoroughly compromised by subsequent treatment. We most recently declined to apply it to the facts before us in *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 766 [69 Cal.Rptr.3d 365]. We had earlier refused to follow it, on constitutional grounds, in *Scott Co. v. United States Fidelity & Guaranty Ins. Co.* (2003) 107 Cal.App.4th 197, 207, 212 [132 Cal.Rptr.2d 89]. The Supreme Court disapproved the latter case, among others, in *Le Francois v. Goel, supra,* 35 Cal.4th 1094, 1107, footnote 5. Although the court did not list *Morite* among the disapproved decisions, its holding—that trial courts retained the inherent power to reconsider their own interlocutory rulings on their own motion—squarely abrogated that decision's holding and rationale. That is, the court in *Morite* had declared that section 1008 applies to reconsideration whether sought "by parties or the court itself." (*Morite, supra,* 19 Cal.App.4th at p. 490.) Nor was this mere dictum, for no motion of any kind was before the trial court in that case—only the footnoted suggestion, in a status conference statement, that the plaintiff " 'believes this case can be resolved pursuant to a motion for summary judgment,' " and that toward that end, " 'th[e] stay order should be lifted . . . .' " (*Id.* at p. 489.) In *Le Francois, supra,* 35 Cal.4th at page 1108, the Supreme Court *explicitly approved* reconsideration based upon a party's request therefor "at a status conference." That decision therefore obliterated both *Morite*'s actual holding and its reading of section 1008.

[10] The *Morite* court suggested, if it did not adopt, an alternative rationale for its result: " 'the general rule that one trial court judge may not reconsider and overrule an interim ruling of another judge.' " (*Morite, supra,* 19 Cal.App.4th at p. 493, quoting *Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1232 [254 Cal.Rptr. 410]; see *Curtin v.*

was made sua sponte, as it manifestly was—posed no threat to the effectuation of legislative purpose as manifest in the statute. The court's reasoning thus rests on the troubling premise that it was free to discern some legislative purpose beyond the terms of the statute and extend those terms to reach that purpose. Such an exercise may of course be undertaken in a proper case, but it must rest on some articulable difficulty in applying the statute according to the apparent meaning of its terms. The court identified no ambiguity or absurdity in the statute, or repugnance to other legislation. The closest it came was in declaring that the statute would be rendered "meaningless" if orders such as the one before it were allowed. But this is simply untrue, for the statute would—as it does—constrain the right of parties to move the court for reconsideration, and to renew previous motions. Many if not most cases applying section 1008 involve applications that are forthrightly labeled as motions for reconsideration. (See, e.g., *Morton v. Wagner* (2007) 156 Cal.App.4th 963, 966 [67 Cal.Rptr.3d 818] ["appellant filed a motion for reconsideration . . ."]; *Morris v. AGFA Corp.* (2006) 144 Cal.App.4th 1452, 1460 [51 Cal.Rptr.3d 301] ["the trial court denied a motion for reconsideration . . ."]; *New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 210 [37 Cal.Rptr.3d 338] [party "moved for reconsideration"]; *Safeco Ins. Co. v. Architectural Facades Unlimited, Inc.* (2005) 134 Cal.App.4th 1477, 1478 [36 Cal.Rptr.3d 754] ["motion for reconsideration"]; *Condee v. Longwood Management Corp.* (2001) 88 Cal.App.4th 215, 217 [105 Cal.Rptr.2d 597].) The sole suggested justification for disregarding the statute's language was thus demonstrably unsound. Yet the court relied on it to impute a purpose appearing nowhere in the statute, and based on that supposed purpose, to extend the operation of the statute beyond its terms. In short, by supposing that the statute reached beyond motions for reconsideration and renewal motions to any *order* revisiting or expressly or impliedly implicating an earlier ruling, the court avoided the question that actually governs the statute's scope: whether a given motion is one for reconsideration, or a renewal of an earlier motion.

Other decisions have similarly attributed to the statute a meaning and effect that cannot be found anywhere in its language. Thus in *Baldwin v. Home Savings of America* (1997) 59 Cal.App.4th 1192 [69 Cal.Rptr.2d 592], a party contended that by citing authority not before the trial court on a previous motion, its motion for reconsideration had satisfied section 1008(a)'s requirement that it be supported by "new or different facts, circumstances, or law." The reviewing court acknowledged that the movant had presented what was

*Koskey, supra,* 231 Cal.App.3d at pp. 876–877, and cases cited.) That, however, is a *court-made* rule, operating quite apart from section 1008. (See *Wyoming Pacific Oil Co. v. Preston* (1958) 50 Cal.2d 736, 739 [329 P.2d 489], cited in *Curtin, supra,* 231 Cal.App.3d at p. 877.) Whether or not it was offended in *Morite,* it certainly had no application here, where the same judge heard both motions.

literally " 'different law.' " (*Baldwin*, at p. 1197.) One might have expected that to end the question, so far as the statute was concerned. But the court then applied the purely judge-made gloss previously applied to newly pre-sented *facts*, i.e., that the movant must *justify* his failure to present the new information in connection with the first motion. (*Id.* at pp. 1198–1199, citing *Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 688 [68 Cal.Rptr.2d 228].) Such a rule may indeed be unobjectionable; it has much to recommend it; a well-considered comprehensive rule regulating repetitive motions would undoubtedly include some version of it. But the court clearly wandered into the realm of penumbral application when it went on to *attribute such a rule to the statute* on the rationale that to omit it would be an "indulgent construction" that "cannot be squared with the jurisdictional nature of the statute." (*Baldwin*, at p. 1200.)

■ Declaring a statute "jurisdictional" with respect to subject X does not alter the definition of X. Nor do courts traditionally extend a statute beyond its terms because failure to do so "cannot be squared" with the statute's general "nature." It is true that statutory terms may sometimes be read more or less "liberally" or "broadly" depending on their effects, but we see no characteristic of section 1008 that requires courts to give it an expansive application. Indeed, it appears to fall squarely within at least one class of statutes that has traditionally been *strictly* construed, i.e., those statutes effecting a procedural *forfeiture*. (See *Dieckmann v. Superior Court* (1985) 175 Cal.App.3d 345, 353 [220 Cal.Rptr. 602] ["Statutes requiring forfeitures for technical defects are to be strictly construed to avoid forfeiture."]; *People v. United Bonding Ins. Co.* (1971) 5 Cal.3d 898, 906 [98 Cal.Rptr. 57, 489 P.2d 1385] ["The law traditionally disfavors forfeitures and statutes imposing them are to be strictly construed."]; *Hernandez v. Temple* (1983) 142 Cal.App.3d 286, 290 [190 Cal.Rptr. 853] [applying rule to responses to requests for admissions under Code Civ. Proc., former § 2033].) Section 1008 inflicts a forfeiture whenever it bars a party from seeking relief to which he would otherwise be entitled. To extend it beyond its terms—to impose such results where it does not plainly call for them—seems irreconcilable with the foregoing principle.

■ We therefore turn to the statute's language to ascertain what constitutes a motion for reconsideration governed by section 1008(a), or a renewal motion governed by section 1008(b). The statute describes the former category not in terms of motions to reconsider some issue, question, or general subject but "applications for reconsideration *of its orders*." (§ 1008(e), italics added.) A motion for reconsideration is thus one that *explicitly directs the court's attention* to a *previous order* and seeks to "modify, amend, or revoke [that] order." (§ 1008(a).) This description is consistent, as far as it goes, with the meaning of the phrase "motion for reconsideration" as used by courts when section 1008 was first amended in 1978 to refer to "reconsider[ation]."

(See Stats. 1978, ch. 631, § 2, p. 2084.) Case law used that phrase to describe a motion explicitly asking the court to "reconsider" an order previously made, and to make a different order in its place—in effect, to reverse itself. (See, e.g., *Pacific Tel. & Tel. Co. v. Redevelopment Agency* (1977) 75 Cal.App.3d 957, 962 [142 Cal.Rptr. 584] ["motion for reconsideration" of order on cross-motions for judgment on the pleadings]; *Big Bear Municipal Water Dist. v. Superior Court* (1969) 269 Cal.App.2d 919, 928 [75 Cal.Rptr. 580] ["motion for reconsideration" of order refusing to disqualify attorney]; *Hall v. Superior Court* (1955) 45 Cal.2d 377, 380 [289 P.2d 431] ["motion to reconsider" order denying husband's motion to fix permanent alimony]; *Truslow v. Woodruff* (1967) 252 Cal.App.2d 158, 160 [60 Cal.Rptr. 304] [in trial proceedings producing "the most verbose and futile" record appellate court had "yet had the misfortune to dissect," "[f]ew rulings were made in respect of which there were not requests for reconsideration"].)

A motion for reconsideration was commonly thought to have two stages: First the court decided whether to grant reconsideration *as such*; only after answering that question affirmatively would it proceed to actually reexamine the merits of the prior order. (See, e.g., *MacDonald v. Superior Court* (1977) 75 Cal.App.3d 692, 695 [141 Cal.Rptr. 667] [minute entry granted " '[m]otion to reconsider' " but left original order intact]; *In re Volkland* (1977) 74 Cal.App.3d 674, 682 & fn. 6 [141 Cal.Rptr. 625] [mother could not complain if, on her motion to reconsider child custody order, trial court also noted additional evidence submitted by opponent; court had "arguably . . . granted appellant's request to 'reconsider' the matter, although it came to the same result upon reconsideration"]; *Sims v. National Engineering Co.* (1963) 221 Cal.App.2d 511, 512, fn. 1 [34 Cal.Rptr. 537] [motion to reconsider was "granted and the original order confirmed on such reconsideration"]; cf. *Big Bear Municipal Water Dist. v. Superior Court, supra*, 269 Cal.App.2d at p. 928 ["where no new grounds are shown a court is not obliged to grant a motion for reconsideration . . ."].)

■ Consistent with this understanding, merely asking the court to grant relief that is *inconsistent with* a prior order, whether by the same or a different judge, is not a "motion for reconsideration." It may be barred by other, court-made rules of law (see fn. 10, *ante*), but it is not barred by section 1008. The Legislature unquestionably has the power to address the field of repetitive motions more comprehensively than it has done in section 1008, but any attempt to formulate a truly comprehensive regime—one that actually served the goal of improved judicial economy without subverting that of correct and just results—would have to do something neither the Legislature nor any court has ever undertaken: to fully sound the complexities of the subject and the numerous variables that may determine what circumstances make it more or less likely that revisiting a question of law, fact, or discretion will serve, or detract from, the ends of justice and judicial economy. Section

1008 does not on its face attempt to so address the subject. Nor does it, by its terms or by any principled application of them, apply to motions not described in it.

Here, to the extent defendants' second motion relied upon the mandatory provisions of section 473(b), it did not ask the court to reconsider its previous order. For all defendants cared, and all this record shows, that order was entirely correct when made; indeed, on the showing then before the court, it is difficult to see how a different order could have been made. The second motion rested on an entirely different legal theory, invoked a different statutory ground, and relied in very substantial part on markedly different facts. It neither asked for, nor sought by sly evasion, a determination contrary to any determination made in the first order. On the contrary, it cited that order as part of the series of events that entitled defendants to relief from the judgment. We therefore decline to view the later motion as one described in, or regulated by, section 1008(a).

### C. *Relief Necessary to Effectuate Main Order*

A distinct question is posed by the potential application of section 1008(b), which governs a second application for "the same order" the court has already declined to make. An "order" is a "direction of a court or judge, made or entered in writing, and not included in a judgment." (Code Civ. Proc., § 1003; see Black's Law Dict. (8th ed. 2004) p. 1129, col. 2 [a "command, direction, or instruction" by a court]; 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 1, p. 428.) It would therefore appear that two motions seek the "same order" when they ask the court to issue the same "direction." In this view, defendants' second motion sought "the same order" as the first insofar as both asked the court to direct that the default have no further effect. To that extent, the second motion arguably constituted a renewal of the first.

We hesitate to finally so conclude, however, for insofar as the two motions rested on entirely distinct factual and legal predicates, we find in the phrase "same order," as used to define the sweep of section 1008(b), a latent ambiguity. The quoted term has a plain enough meaning on its face, but its literal application can produce results that are arguably absurd, and were surely not intended by the Legislature. Suppose for example that a defendant moves to dismiss on the ground that the plaintiff has failed to serve and return summons within three years. (Code Civ. Proc., §§ 583.250 subd. (a)(2), 583.210, subd. (a).) The trial court denies the motion, but the plaintiff then sits on his hands for another three years. Surely section 1008 is not intended to bar a second motion to dismiss, this one asserting the plaintiff's failure to bring the matter to trial within five years. (Code Civ. Proc., §§ 583.360,

subd. (a), 583.310.) Yet the second motion seeks "the same order" as the first—a directive that the complaint be dismissed—and thus falls within the literal terms of section 1008(b). And this reading is arguably strengthened by the statute's explicit inclusion within its scope of renewed motions based on "new or different facts, circumstances, or law." Conceivably the Legislature intended a distinction between "facts, circumstances, [and] law" on the one hand, and *grounds* on the other, such that two motions seeking the same relief *on different legal theories* would not be viewed as seeking the "same order." Such a gloss, however, finds as little basis in the actual language of the statute as the interpretations we have criticized above—though it does respect, as they do not, the rule resolving statutory ambiguities against forfeiture. The problem, in any event, illustrates one of the central defects in section 1008 as presently drawn: It attempts to prescribe a simple categorical rule to govern a subject whose nuance and complexity make it eminently better suited to the evolutionary, incremental processes of common law adjudication, or at least to the close and sustained attention of experts.

██ Assuming (without deciding) that defendants' second motion sought the "same order" as the first *in part*, the question becomes what effect such overlap should have. We emphatically reject the proposition that a motion seeking a previously denied order *in addition to* newly requested relief is thereby *entirely barred*, as if its repetitive aspect somehow tainted the whole. Plaintiff implies otherwise, suggesting that the judgment and the underlying default are so closely related that relief from either is the "same order" as relief from the other. This seems to be just another invocation of the penumbral approach to section 1008 that we have already refused to adopt. We assume the statute means what it says, at least to the extent that insofar as two motions do *not* seek the "same order," the second is not subject to section 1008(b).

Nor do we find any support for plaintiff's position—quite the reverse—in *Sugasawara v. Newland* (1994) 27 Cal.App.4th 294, 298 [32 Cal.Rptr.2d 484]. The question there was how to apply the six-month limitation for obtaining mandatory relief based on attorney fault under section 473(b), when the motion for relief is filed within six months of the default *judgment*, but more than six months after entry of the underlying default. The court concluded that the statute allows six months from the entry of the *judgment* to obtain relief from *both* the judgment and the underlying default. (27 Cal.App.4th at p. 297.) The court refused to extend the statute's prohibitory effect beyond its plain terms, writing that "[a]bsent very exceptional circumstances, none of which is presented here, we are not permitted to do that. [Citation.]" (*Ibid.*)

However plaintiff quotes the case for a passage that in turn quotes a legislative committee report as follows: " '[I]t makes little sense to vacate a

judgment without also vacating an underlying default . . . .' (Assem. Com. on Judiciary, Sen. Bill No. 882 (1991).)" (*Sugasawara v. Newland, supra,* 27 Cal.App.4th at p. 297.) This language simply acknowledges that to grant relief from a judgment, but not the underlying default, would be absurd. At least one aspect of the absurdity is illustrated by this case. As the matter now stands, defendant is the beneficiary of a permanent injunction entered by default. If the judgment were vacated because defendants had shown an entitlement to relief, but the default were deemed beyond relief under section 1008(b), the injunction—currently operating in plaintiff's favor—would cease to have effect. Plaintiff of course could apply for another judgment, but if defendants remained in default, they would be barred from contesting it. Any ensuing judgment would thus continue to be marred by whatever cause had placed them in default in the first place. Since we would have already held that cause sufficient to sustain mandatory relief under section 473(b), defendants would seemingly be entitled, once again, to vacate any new judgment. Thus an order vacating the judgment, but leaving defendants in default, would effectively prevent *either* side from advancing its own position, or the lawsuit. The only apparent way to escape this procedural Sargasso—other, perhaps, than by stipulating to lift the default—would be for the parties to abandon the present lawsuit and litigate their differences in a new one. This is not the judicial economy the Legislature presumably had in mind when it declared its intention to "reduce the number of motions to reconsider and renewals of previous motions heard by judges in this state." (Stats. 1992, ch. 460, § 1, p. 1831.)

We conclude that, assuming the second motion was a renewal of the first motion insofar as it sought relief from the underlying default, it was not barred by that fact, in whole or part, because the relief thus sought was ancillary to, and would be necessary to carry into effect, the order vacating the judgment, which was subject to no such constraint.

### D. *Conflict with Section 473(b)*

Even if section 1008 applied by its terms to defendants' second motion—or that motion could on some other coherent rationale be held to come within the statute's scope—we would decline to attribute to the statute a legislative intention to bar the operation, under the circumstances shown here, of the mandatory relief provisions of section 473(b).

■ Section 473(b) as a whole is the primary statutory source of the trial court's authority to grant relief from orders or defaults entered against a party through mischance. Prior to 1988, the statute allowed relief, in the trial court's discretion, where the order sought to be vacated was the product of the "mistake, inadvertence, surprise, or excusable neglect" of the moving

party or of those—primarily his attorneys—whose conduct was imputed to him. (§ 473(b).) In 1988 the Legislature inserted language *mandating* relief where the order was due to attorney fault, whether excusable or not.[11] This provision was manifestly intended to end the prior regime insofar as it had relegated victims of inexcusable attorney neglect to a separate action for malpractice. (*Metropolitan Service Corp. v. Casa de Palms, Ltd.* (1995) 31 Cal.App.4th 1481, 1486–1487 [37 Cal.Rptr.2d 575].) That remedy was not only uncertain and expensive for the client, but extremely inefficient for the justice system as a whole, in that it generated a complex second lawsuit, typically involving the virtual re-creation of the first in order to prove causation and damages, rather than simply litigating the first one on the merits by lifting the default—having due regard, in the process, for any harm suffered by the opposing party as the result of the attorney's conduct. The Legislature's solution—which makes up in elegance what section 1008 so sorely lacks—was to mandate relief upon the attorney's attestation to his own fault, while minimizing prejudice to the opposing party by entitling him to reasonable compensation for his fees and costs. (§ 473(b).)

Here, as detailed in the following part, defendants made the required prima facie showing for mandatory relief under section 473(b) by submitting the affidavit of their original attorney detailing the erroneous opinions, advice, and fundamental procedural misconceptions and missteps that produced the original default, as well as the ensuing judgment. Section 473(b) provides that "whenever" such a showing is made, "the court shall . . . vacate" the resulting default and judgment. By contending that section 1008 barred such relief, plaintiff brings the two statutes into direct conflict.

Insofar as such a conflict actually exists, it must be resolved in favor of allowing relief under section 473(b), not denying it under section 1008. As we have already said, section 1008 inflicts a procedural forfeiture, such that uncertainties should be resolved *against* its application. Section 473(b), in contrast, is a *remedial* statute, and as such is to be construed liberally, which is to say expansively, to favor its object that cases be adjudicated on the merits rather than determined by default. (*Rodrigues v. Superior Court* (2005) 127 Cal.App.4th 1027, 1036–1037 [26 Cal.Rptr.3d 194]; see *H. D. Arnaiz,*

---

[11] As presently worded, this provision states, "Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, or (2) resulting default judgment or dismissal entered against his or her client, unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect. The court shall, whenever relief is granted based on an attorney's affidavit of fault, direct the attorney to pay reasonable compensatory legal fees and costs to opposing counsel or parties." (§ 473(b).)

*Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1368 [118 Cal.Rptr.2d 71].) The same result follows from the familiar principle that in the event of conflict, specific provisions must prevail over more general ones. (*Wells v. One 2 One Learning Foundation* (2006) 39 Cal.4th 1164, 1208 [48 Cal.Rptr.3d 108, 141 P.3d 225]; *People v. Superior Court* (*Cooper*) (2003) 114 Cal.App.4th 713, 720 [7 Cal.Rptr.3d 862].) Section 1008 deals with the general subject of motions to reconsider previous orders and renewals of previous motions. Section 473(b) deals with applications for relief from a default or default judgment entered through the fault of the defendant's attorney. As the latter subject is considerably narrower and more specific than the former, the latter provision will, absent some countervailing consideration, govern in any conflict.

We observe that this is not a case where a party invokes the mandatory provisions of section 473(b) unsuccessfully, and then seeks to invoke them again. We doubt that any categorical rule could govern such situations, for in some cases the second motion may be only a rehash of the first, while in others it might assert attorney mistakes directly involved in *bringing about the first denial.* Here the first motion neglected even to invoke the attorney fault provisions, or to acknowledge as a fact counsel's role in bringing about his clients' default. Indeed, that very failure is an additional instance of attorney fault that directly caused the entry of the default judgment. Had counsel then submitted the declaration he submitted later—after defendants relieved him and engaged new counsel—the trial court would have been obliged to lift the default and permit the matter to proceed. Although counsel did not in his later declaration separately acknowledge this failure as an instance of fault, no other reasonable conclusion can be drawn.

Plaintiff seems to suggest that even though defendants' first motion did not assert attorney fault as a ground for relief—or present the factual predicate for such relief—it must be *deemed* to have done so, because it *could* have done so. This at any rate is the apparent implication of plaintiff's assertion that "a motion for reconsideration looks [not only] at what was previously argued and presented [but also at] what could have been argued and presented. See, *Morris v. Agfa*[, *supra*,] 144 Cal.App.4th 1452, 1460; *New York Times Co. v. Superior Court*, [*supra*,] 135 Cal.App.4th 206, 212–215."

The rule thus asserted is a corollary of the court-made rule, to which we have already adverted, that one bringing a motion governed by section 1008 must not only present "new or different facts, circumstances, or law" to justify it (§ 1008(a), (b)), but must also justify the failure to present these materials sooner. That concept apparently originated in *Blue Mountain Development Co. v. Carville* (1982) 132 Cal.App.3d 1005, 1013 [183 Cal.Rptr. 594], where the court found it mandated by policy considerations. But it was

manifestly viewed there only as a *sufficient ground* for the trial court, *in its discretion*, to refuse to recognize newly proffered evidence. (See *ibid.* ["if a party seeks reconsideration of an interim ruling without a showing of newly discovered evidence, the trial court has discretion to grant or deny the motion"].) Insofar as later decisions have magnified this sound discretionary consideration into a categorical requirement, and somehow attributed it to section 1008, we decline to follow them. (See *Garcia v. Hejmadi, supra*, 58 Cal.App.4th 674, 689, quoted in *New York Times Co. v. Superior Court, supra*, 135 Cal.App.4th at p. 212; *Robbins v. Los Angeles Unified School Dist.* (1992) 3 Cal.App.4th 313, 317 [4 Cal.Rptr.2d 649].)

In any event, in enacting the mandatory relief provisions of section 473(b), the Legislature presumably made a judgment—with which it is difficult to quarrel—that attorney fault *itself* furnishes an adequate justification for failure to present the new matter earlier. Therefore whatever the soundness and scope of the cited rule, it cannot operate in derogation of the right to mandatory relief under section 473(b) when the very failure to "previously argue[] and present[]" the legal and factual grounds for such relief was itself a manifest instance of attorney fault.

We conclude that defendants' motion to vacate the judgment and set aside the underlying default was not barred, in whole or part, by section 1008.

II. *The Trial Court Erred in Denying the Motion to Vacate on Grounds of Attorney Fault*

A. *Sufficiency of Defendants' Showing*

In considering whether the trial court properly denied relief under section 473(b), the first question is the sufficiency of defendants' showing of attorney fault, if believed, to trigger the mandatory relief provisions of that statute. Since this determination depends on the application of legal principles to a set of facts that is, for this purpose, undisputed, it presents a pure question of law as to which we are in no respect bound by, or obliged to defer to, the trial court's express or implied determination.

Under section 473(b), a party is entitled to relief from a default and resulting judgment whenever, on timely application for relief, his attorney "attest[s] to his or her mistake, inadvertence, surprise, or neglect" in connection with the default or the judgment. (§ 473(b).) Here Attorney Hu attested that he believed the service on both defendants was defective; that he had so informed his clients, telling them "that they were not required to answer the complaint under U.S. law"; that he failed to recommend that they move to quash summons or otherwise respond to the complaint; and that he expected

to "receive notice of any application for entry of default before default was entered so that we could respond." He also acknowledged that he was responsible for advising defendants in connection with, and preparing, the first motion for relief from the default; that in doing so he "believed that the Court would set aside any default because of an invalid service of process"; and that he omitted "any argument showing that there was a 'mistake, inadvertence, surprise, or excusable neglect' in WEC and Winbond Israel's motions." Although he did not separately point it out, he also indisputably omitted from defendants' first motion any invocation of the mandatory relief provisions of section 473(b), and the required showing to support such an invocation.

That these averments demonstrated attorney fault seems plain. First, there was no apparent basis for Hu's confidence that service was ineffective, or more to the point, that it would be *found* ineffective by any court likely to consider the issue. The sufficiency of service *as to WIL* may have been debatable, because that service was governed by the Hague Service Convention, which a substantial number of decisions have held not to authorize service of process by mail. (See *Denlinger v. Chinadotcom Corp., supra,* 110 Cal.App.4th 1396, 1399–1400, citing cases.) This court, however, has squarely declined to follow those cases, adhering instead to what we described as "the better, and more modern, view," which construes the convention to permit service of process by mail in the absence of specific objection thereto by the adhering country. (*Id.* at p. 1400; see *id.* at p. 1404 ["We think the view that article 10(a) allows service of process by mail represents the better position."].) Since there was apparently no evidence that Israel had objected to such service—or at least no competent showing to that effect—WIL could only have prevailed by persuading a trial court to apply a rule we had quite deliberately, and explicitly, rejected. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

 Moreover, whatever Hu might reasonably have believed about service on WIL, the notion that service on *WEC* was defective was never shown to have even an *arguable* foundation in law. Because Taiwan was not a signatory to the Hague convention, WEC could be served by any method conforming to California law and consistent with due process. (*Volkswagenwerk Aktiengesellschaft v. Schlunk* (1988) 486 U.S. 694, 707 [100 L.Ed.2d 722, 108 S.Ct. 2104].) California law permits any person outside the state to be served by certified mail, return receipt requested. (Code Civ. Proc., § 415.40.) Such service is effective for defendants served in countries not adhering to the Hague Service Convention. (*Bolkiah v. Superior Court* (1999) 74 Cal.App.4th 984, 1000 [88 Cal.Rptr.2d 540]; Code Civ. Proc., § 415.40.) Given these principles, there was no apparent deficiency in the service on WEC, so far as a California court would be concerned.

Indeed Hu's jurisdictional argument concerning WEC conceded this point by omission, and thereby betrayed a fundamental error in his legal advice, at least as it concerned WEC. The only basis he ever offered for questioning the service on WEC was that a *Taiwanese* court would not recognize a judgment from a foreign court unless the complaint had been served under its supervision pursuant to letters rogatory from a suitable American authority. Assuming this indeed reflects the views of the Taiwanese courts, it appears immaterial to any question that would arise prior to judgment in this lawsuit. The only question before a California court would be whether service complied with California law and the federal Constitution. If the answer to that question was affirmative, the court would consider itself vested with jurisdiction, meaning that it had the power to enter judgment, and *would do so by default* in the absence of a filed response to the complaint. The views of the Taiwanese courts would become relevant only if plaintiff found it necessary to *enforce* the judgment in Taiwan. But that appears especially unlikely here, where plaintiff sought not damages but *injunctive relief.* Any proceedings to enforce such a decree were likely, if not certain, to be take place before the court that issued the judgment, i.e., the superior court of California. This meant that whatever its validity in Taiwan, the judgment— which explicitly enjoined defendants and those "in active concert or participation with them"—would constitute a potent weapon with which to threaten not only defendants but other persons, perhaps more readily brought personally before the court, who might be charged with acting in violation of its terms. (See *Planned Parenthood Golden Gate v. Garibaldi* (2003) 107 Cal.App.4th 345, 353 [132 Cal.Rptr.2d 46].) In other words, anyone doing business with defendants in a way arguably offending the injunction might be simply buying a lawsuit or a charge of contempt. This was presumably a serious threat to defendants' interests, no matter how worthless the judgment might appear to a court in Taiwan.

No prudent lawyer would gamble his client's right to a defense on such a rationale. Indeed, although we wish to refrain from declaiming too emphatically upon factual issues that are not strictly necessary to the decision before us, we believe a prudent lawyer would emphatically warn against such a dangerously passive strategy, and would permit his client to pursue it, if at all, only after making certain that the client understood that it was likely to produce a judgment—and quickly. There was, after all, an alternative means for challenging service without being exposed to a default: a motion to quash. (See Code Civ. Proc., §§ 418.10, subd. (a)(1), 585, subd. (a), 586, subd. (a)(4), 412.20, subd. (a)(3).) Hu acknowledged that he never advised his clients of this possibility, telling them only "that they were not required to answer the complaint under U.S. law." But even if that were true we can conceive of no advantage to his clients in waiting for plaintiff to seek, and perhaps secure, a default, rather than bring a motion to quash. Plaintiff has

implied at various times, and the trial court may have believed, that this was a deliberate strategy to delay the lawsuit, but a party truly bent on delay—and aware of the risks of doing nothing—would move to quash and, if that failed, seek appellate review until all opportunities therefor had been exhausted. Any suggestion that defendants—or Hu—deliberately incurred a default for tactical reasons is like suggesting that a person who has been run over by a speeding train must have deliberately leapt in front of it. Such things happen, of course, but we have a term for them: suicide. No one jumps in front of a train *to slow it down.*

The only explanation we can conceive for Wu's do-nothing approach is that he was laboring under the grossly mistaken supposition—or as he described it, "expect[ation]"—that he would "receive notice of any application for entry of default before default was entered so that we could respond." Code of Civil Procedure section 587 requires the party requesting a default to certify that a copy of the request has been *mailed* to the defendant or his attorney of record, if any. Since defendants then had no attorney of record this required only that copies of the request be mailed to them—as they were—at their offices in Taiwan and Israel. There was no requirement that this mailing precede the entry of default by any specified time. Indeed it is not required that the defendant *receive* the copy at all, so long as the requester certifies that it has been sent. (Code Civ. Proc., § 587.) The copy is typically deposited in the mail on the same day the request is submitted to the clerk, rendering it virtually impossible that the defendant will receive it before the default is entered.

Nor can a defendant do anything to avert a default—without filing a responsive pleading or motion to quash—even if he knows in advance the exact time and place the plaintiff intends to seek it. A request to enter default is presented to the clerk of the court, whose duty is purely ministerial. (*Lorenz v. Commercial Acceptance Ins. Co.* (1995) 40 Cal.App.4th 981, 991 [47 Cal.Rptr.2d 362].) The clerk "shall" enter the default if the statutory conditions appear on the face of the record. (Code Civ. Proc., § 585, subds. (a), (b), (c).) "The clerk may not take outside evidence, or make a judicial determination of disputed matters not apparent on the face of the record." (6 Witkin, Cal. Procedure, *supra*, Proceedings Without Trial, § 160, p. 601.) Thus even if plaintiff's counsel had invited Hu to accompany him to the courthouse, there is nothing Hu could have done to avert the default, other than to file a qualifying responsive pleading (or motion) before the clerk checked the file. Hu's belief that he would have some further opportunity to

intervene, after negotiations over a response date had broken down and the deadline announced by plaintiff's counsel had arrived, lacked any apparent basis in fact or law.[12]

Further, although Hu did not explicitly acknowledge fault in the preparation of defendants' first motions to set aside the default, his declaration coupled with matters of record made a strong showing of attorney fault in that regard as well. The initial moving papers in support of those motions were so deficient—factually, legally, and logically—as to defy ready explanation. There was no attempt by either defendant to compare its conduct in suffering a default to that which was held in existing precedent to warrant relief under the discretionary provisions of section 473(b). The closest either defendant's moving papers got to the concept of "mistake, inadvertence, surprise, or excusable neglect" (§ 473(b)) was to assert the reasonableness of their conduct in seeking to negotiate an extension of time with plaintiff, and in their reply briefs, to assert *their own* erroneous belief that service was defective. Neither of these furnished a compelling ground, and arguably neither furnished a *sufficient* ground, for discretionary relief. Counsel's mistakes, in contrast, *entitled* them to relief—if only he had acknowledged them and invoked that part of the statute.

Hu's affidavit and the record as a whole overwhelmingly established that the default and ensuing judgment were the products of attorney fault.

### B. *Strategy Originating with Client*

Once the movant's attorney has "attest[ed] to his or her mistake, inadvertence, surprise, or neglect," the statute mandates relief "unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect." (§ 473(b).) It would seem obvious that where an attorney misadvises the client about the risks in not answering a complaint, and the client fails to answer, and a default is thereafter taken, the attorney's misadvice has *caused* the default, and any ensuing judgment. It also seems obvious that when the same attorney seeks relief from the default without citing his own errors and invoking the mandatory relief provisions of section 473(b), this constitutes a further instance of neglect and a substantial further cause of the denial of that motion and the entry of the judgment.

Obvious as such an inference would seem, defendants did not leave the question to inference. They submitted ample positive evidence that their agents relied on Hu's advice and his repeated assurances that they need not

---

[12] Conceivably Hu was more familiar with federal practice—it appears that he represented WEC in a federal suit in Utah—but federal law does not appear materially different in these respects. (See *Hawaii Carpenters' Trust Funds v. Stone* (9th Cir. 1986) 794 F.2d 508, 512.)

answer the complaint. Hu himself declared that defendants followed and relied upon his advice in not answering the complaint. He also acknowledged his responsibility in advising them in connection with relief from the default, and preparing the motion seeking same.

Plaintiff attempts to overcome this evidence, first, by suggesting that defendants themselves dictated the strategy of refusing to file a response to the complaint, and that this conduct, not Hu's errors, caused the default. This argument appears to depend on a tortured reading of the trial court's statements in connection with defendants' first motion for relief. According to plaintiff, the court then found that "Winbond (*as opposed to its counsel*) was responsible for the Default having been entered." (Italics added.) Far from sustaining this characterization, the trial court's remarks flatly contradict it. In the pages of the reporter's transcript cited by plaintiff, the court said, "I see this not as an active mistake, inadvertence, surprise, excusable neglect, but in fact a calculated maneuver *on behalf of* Winbond to delay this matter. [¶] . . . [H]aving read all the correspondence and e-mail *between the two counsel*, I'm led to believe that this was a calculation *on the part of* Winbond and not anywhere close to mistake, inadvertence, surprise or excusable neglect." (Italics added.)

Plaintiff invites us to construe these remarks as a finding that the "calculated maneuver" leading to the default originated with defendants, rather than their attorneys. We cannot countenance this unprovoked assault on the English language. In the cited passage, the court first referred to a "maneuver *on behalf of* Winbond." "Behalf" means "interest" or "benefit," and "on behalf of" means "in the interest of" or "as a representative of." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 103, capitalization omitted.) These remarks thus reflect recognition by the court that while the "calculated maneuver" might be *imputed to* defendants for purposes of *discretionary* relief, it originated with counsel. Plaintiff therefore speaks literal truth by referring to a finding that "the failure to file a responsive pleading was a calculated maneuver *on behalf of Winbond (as opposed to its counsel)*." The import of this finding, however, is the exact opposite of what plaintiff hopes to convey. The plain implication of the court's words is that *counsel*, as *representative of* Winbond, engaged in a "calculated maneuver."

The court did go on mention "a calculation *on the part of* Winbond." The italicized phrase is sometimes used as a verbose substitute for "by," but its more accurate meaning is simply "with regard to." (Merriam-Webster's Collegiate Dict., *supra*, p. 844.) At worst the court's usage is ambiguous, and the ambiguity is dispelled by its explicit citation to the "correspondence and e-mail between the two counsel" as the basis for this characterization. The court plainly recognized what common sense would lead anyone to expect: the strategy originated with counsel, not with his clients.

Plaintiff also seeks to draw support from the court's written order on the earlier motion, but this depends on a still more tortured reading of the court's words. The court wrote in pertinent part, "There is no factual support for defendants' assertion that default was entered due to mistake, inadvertence, surprise or excusable neglect. The court does not find credible defendants' assertion that they lacked familiarity with court procedures. 'Absent an "attorney affidavit of fault," *an attorney's mistake of law is charged to the client, and mere ignorance of the law or negligence in conducting legal research is not excusable neglect.*' [Citations.] *Defendants' mistaken belief that service was improper* does not amount to excusable neglect or a mistake of law which would justify relief in this instance. *If defendants believed service to be improper, defendants could have filed a motion to quash.* The evidence reflects defense counsel's attempt to negotiate a lengthy extension of time to respond. . . . While attempting to settle this litigation is laudable, *defendants had an obligation to file a responsive pleading or affirmatively seek the appropriate relief from this court. Defendants' counsel received adequate warning* of plaintiff's intent to seek default." (Italics added.)

Far from suggesting an allocation of personal blame to defendants, this passage reaffirms the court's perception that defendants were *charged with*, though not personally guilty of, the inexcusable neglect of their attorney. It acknowledges their "mistaken belief" that service was improper, on which, implicitly, they predicated their actions (or failures to act). It goes on to note that this did not constitute *excusable* neglect because it rested on "an attorney's mistake of law" which must be viewed as inexcusable neglect, which in the absence of an affidavit of fault, must be imputed to his clients. Implicitly, the same reasoning applied to defendants' failure to protect themselves by moving to quash: this was either ignorance of the law, which is no excuse, or attorney negligence, which was imputed to them. The court also refused to credit the averments by defendants' participating agents that they lacked familiarity with California procedures. But that finding was superfluous because, as the court pointed out, a layperson's ignorance of law is not excusable neglect in any event, and an attorney's ignorance, also inexcusable, is imputed to the client.[13]

---

[13] The finding manifestly resulted from a successful campaign by plaintiff to "poison the well" by suggesting—disingenuously, as it turned out—that defendants were highly experienced litigants in California courts. In opposing their first motion, plaintiff repeatedly asserted that Winbond had been a party in 170 lawsuits in California courts, the obvious implication being not only that it was a veteran California litigant, but that it conducted business in a way that brought it frequently into court. Only after defendants engaged new counsel was any response to this assertion offered, in the form of the following averments from Huh: "Of the 170 proceedings cited in which WEC was a named party, 169 of them were a large group of class action, copy-cat antitrust complaints, in which most computer memory makers, including WEC, were sued. These class action cases were consolidated into DRAM, SRAM, and flash memory case groupings. In the first of the DRAM cases, WEC was served in Taiwan through

In sum, nothing said by the court in connection with the first motion suggests that it expressly or impliedly found any personal fault on defendants' part, as distinct from attorney fault imputed to them. Nor does plaintiff offer any cogent ground upon which such a finding might rest. As nearly as we can determine, the whole claim rests on a highly tendentious reading of the first declaration of WEC executive Huh, from which plaintiff extracted the following averments to paint him as the tactical genius behind defendants' suicidal strategy: (1) Huh was, in his own words, "responsible for all corporate legal matters, litigation management, [and] coordinated defense of pending litigation with outside counsel." (2) Huh believed that a judgment resting on service by mail is "unenforceable with the judicial authorities in Taiwan." (3) "Consistent with the Taiwan law, Winbond does not respond to foreign complaint [*sic*] when service of process is defective. Winbond intended to respond to SMSC's Complaint after it is properly served upon Winbond pursuant to Taiwan law, which requires a Letters Rogatory [*sic*] and a certified translation of the document served and requires both them [*sic*] be addressed to Winbond from the Judicial Authority of Taiwan." (4) As of mid-December 2007, after receiving the summons and complaint by mail, "Winbond was in contact with several law firms in the United States to seek advice regarding the matter. It had not yet retained U. S. counsel for the matter." (5) Around that time, WEC "authorized Akin Gump to represent it for the limited purpose of requesting SMSC to cure its defective service of process and seeking to resolve the defective service issue by extending the time Winbond has [*sic*] in responding to the Complaint without contesting the defective service, while deciding what U. S. firm to engage for the matter." (6) As of January 2, 2008, WEC had not decided "what U. S. firm to engage for the matter." (7) At some unspecified time in January, defendants "retained Akin Gump as counsel in this matter."

None of these averments lend substantial evidentiary support to the facially fanciful notion that, contrary to both men's declarations, it was Huh who had Hu hew to the passive strategy that produced such disaster. Moreover, even if the strategy were shown to emanate from Huh—contrary to all direct evidence, and all plausible inferences—it would still be marred by attorney fault in the absence of adequate warnings by Hu of its likely consequences.

---

letters rogatory that were issued to the Taiwan courts, the summons and complaint were translated into Mandarin Chinese, and papers served under Taiwan law through the Taiwan courts. In most of these cases, WEC's retained U.S. outside legal counsel negotiated substantial extensions of time to respond. WEC diligently and timely responded to all pleadings and discovery in the DRAM cases. In the SRAM and flash case groups, WEC was able to negotiate dismissals in *all* of the cases and did not answer *any* of the complaints. In the 170th case cited by [plaintiff], WEC was the plaintiff."

Unfortunately it appears that the antidote was administered too late to counteract the poison.

So far as is shown by the facts in this record, those warnings should have included the following points, at a minimum: (1) A California court, particularly within this appellate district, would probably uphold service by mail as to *both* defendants, and would certainly do so as to WEC. (2) In view of that fact, a failure to file responsive pleadings would expose both defendants, and particularly WEC, to a default, and hence a default judgment. (3) Given the injunctive character of the relief sought, a default judgment could very much injure their interests, whether or not it would be recognized in their home countries. (4) They could avoid that risk *and* test the validity of service by filing a motion to quash.

There is no suggestion in this record that defendants were aware of *any* of these points when they suffered their defaults to be taken. On the contrary, they were told that the service was defective and that they had no obligation to respond to the complaint in any way. In the presence of this affirmative misadvice, and the absence of any evidence of independent knowledge to the contrary, it is impossible to discern any basis for charging defendants with all, or any substantial part of, the fault leading to the judgment against them.

## C. *Existence of Duty of Care*

In a footnote, plaintiff suggests that defendants' original moving papers reveal that they had not yet hired Hu at the time of his original misadvice to them. This is apparently an allusion to the supposed rule, asserted by plaintiff's counsel at the hearing on the first motion, "that you can't blame the lawyer if you haven't retained the lawyer." It would be charitable to describe this statement as a gross oversimplification of the somewhat complex area of law concerning the circumstances that will burden an attorney with a duty of care toward another. (See *Streit v. Covington & Crowe* (2000) 82 Cal.App.4th 441, 444–447 [98 Cal.Rptr.2d 193].) We need not delve into this subject because the papers in question do not sustain the factual premise that defendants had not engaged Hu. WIL's Mizrahi declared that his principal engaged Hu and his firm "[o]n or about December 20, 2007, . . . to represent it for the limited purpose of negotiating with SMSC regarding an extended deadline to respond to the Complaint, while deciding what U.S. firm to engage for the matter." Huh's declaration contained an almost identical averment as to WEC. At most these averments show that defendants had not yet finally engaged Hu and his firm *to represent them in this action.* Huh later refuted plaintiff's characterization of them directly, while indicating that the limited nature of the initial engagement was itself the product of Hu's advice. According to Huh's uncontroverted averment, it was on Hu's recommendation that defendants authorized him to contact plaintiff's counsel to negotiate a date to respond to the complaint. "This," Huh declared, "is the 'limited purpose' stated in my declaration of February 5, 2008 . . . ." He continued,

"Winbond granted Mr. Hu all the authority he said he needed . . . . [¶] . . . [¶] . . . If Mr. Hu had told us that Winbond needed to appear for any reason and that we needed to authorize an attorney to appear in court, we would have promptly authorized him to act, guided by his legal advice on what was needed to comply with U.S. and California laws, and to negotiate and retain him as our trial counsel."

Here again plaintiff's argument—or suggestion—lacks substantial evidentiary support in the record.

### D. *Deliberate Strategy by Counsel*

In denying defendants' motion to vacate the judgment, and in rejecting their invocation of the mandatory provisions of section 473(b), the court did *not* find that the default was caused by something other than the conduct of defendants' attorney. Rather it appeared to conclude that his conduct did not qualify for relief because it reflected a "deliberate tactical decision not to file a responsive pleading." On its face this finding is entirely compatible with the existence of attorney fault. An attorney may, through mistake or neglect, make a "deliberate tactical decision" that is in fact quite unsound and severely detrimental to his client. Indeed this is exactly what the evidence here showed, without contradiction or conflict.

The court's only indication of the perceived relevance of the quoted finding was its citation of *Jerry's, supra,* 134 Cal.App.4th 1058. In that case a group of plaintiffs and their attorney chronically ignored requests and orders to make discovery. When they persisted in this conduct after a judicial threat to impose terminating sanctions, the court dismissed their claims. One of their attorneys then moved for mandatory relief, citing various afflictions she had suffered as well as miscommunications between herself and cocounsel. The defendant filed materials casting doubt on the claim of illness. The trial court denied the motion. The reviewing court affirmed, finding the conduct of counsel so obstructive and egregious that it could not be permitted to form the basis for relief under section 473(b). (*Jerry's,* at pp. 1073–1074.) It acknowledged its own decision in *Metropolitan Service Corp. v. Casa de Palms, Ltd., supra,* 31 Cal.App.4th at page 1488, where the plaintiff had argued that the defendant's "failure to answer the complaint was part of a scheme to hinder and delay plaintiff by abusing the judicial process." In that case the court had rejected the argument, observing, "If plaintiff means that defendants deliberately defaulted, with a premeditated plan to have the default set aside later, the hearing in the trial court does not suggest the court believed defendants acted in such a diabolical way." (*Ibid.*) The record in *Jerry's,* in contrast, showed "exactly that." (*Jerry's, supra,* 134 Cal.App.4th at

p. 1073.) When counsel failed to oppose the motion to dismiss, the court declared, her "obvious plan was to claim attorney fault and revive the claims through a section 473(b) motion for relief." (*Id.* at p. 1074, fn. omitted.) This rendered her invocation of the attorney fault provisions of that statute intolerable: "If we were to hold that counsel's actions were subject to automatic, mandatory relief, we would be rewarding and encouraging this wholly improper conduct. A party cannot justly be permitted to seek relief under section 473(b) from sanctions imposed for deliberate failure to respond to discovery or oppose discovery motions." (*Ibid.*)

 This is a compelling argument from policy, but beyond it the rationale of the adopted rule, and thus its scope, are unclear. The holding may be readily harmonized with the governing statutory language on the premise that when an attorney brings about his client's default through wilful disregard of discovery or similar obligations, his conduct does not constitute "mistake, inadvertence, surprise, or neglect" for purposes of section 473(b). Similarly, if an attorney deliberately causes his client to incur a default *while intending to later invoke his own "neglect" to set it aside*, there is in fact no "neglect" to invoke—nor any mistake, inadvertence, or surprise. In both situations it might be said that while the attorney has failed to act in a manner that would avoid default, he has not *neglected* to do so. The latter term connotes some form of *negligence*, misapprehension, or mischance, not a wilful and deliberate act. Where there is no "neglect"—or mistake, surprise, or inadvertence—there is no predicate for mandatory relief under section 473(b). The attorney's very intention to invoke that statute, rather than cause his client to comply with his obligations as a litigant, disqualifies him from doing so.

Here, however, there were no facts on which to predicate application of this rule. It is true that Hu and his clients made a conscious decision *not to respond to the complaint*, but their uncontested testimony was that they did so in the mistaken belief that they had not been properly served with process. Had that belief been correct, they would have been under no duty whatever to respond. (See *Slaughter v. Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236, 1251 [209 Cal.Rptr. 189] [defendant has "no duty to act upon a defectively served summons"].) Hu in effect believed, and told his clients, that they were protected by that principle, along with certain other mistaken expectations he held. Their failure to plead was thus not the kind of "improper conduct" the court in *Jerry's* was loath to "reward[] and encourage[e]." (*Jerry's, supra,* 134 Cal.App.4th at p. 1074.) It was not the product of their or their attorney's willfulness, but of his neglect.

Nor is there any evidence that defendants or Hu intended to bring on a default and secure its later vacation. Indeed from their original moving papers it appears singularly plain that they were surprised by the default and unprepared to seek relief on any cognizable ground, since they were still laboring under the misapprehension that service had been defective. Certainly there was no evidence that they intended to invoke the attorney fault provisions of section 473(b), for they never did so until after the court had denied relief from the default and entered a judgment against them. In their original moving papers they did no more than allude to section 473(b), offering no evidence or argument directed to its criteria. Even when they finally attempted to establish the criteria for *discretionary* relief, they failed to invoke the surest and most obvious remedy, which was the statutory language providing *mandatory* relief.

 Of course, if one carried plaintiff's rope-a-dope hypothesis as far as mere fancy will allow, one might suppose that having craftily suffered a default for purposes of delay, they were just as happy to take a fall on the first motion for relief and to endure a permanent injunction against them, all in the expectation of securing relief from it too when they finally acknowledged the role of attorney fault and invoked the mandatory provisions of section 473. But fancy affords no basis for adjudication. Perhaps it will someday occur that a defendant has so little to lose from a default judgment that he is willing to gamble on securing the mere purchase of delay that would come from suffering its entry and then seeking its vacation based upon a trumped-up claim of attorney fault. It is difficult to formulate a credible set of circumstances in which such a strategy would actually make sense, but we cannot rule it out in the abstract. It is sufficient to the present occasion to say that there is no evidence in this record on which to attribute such an intention to defendants or their attorney. Nor did the trial court appear to do so. It simply read *Jerry's* more broadly than the governing statute will permit. So far as this record shows, defendants' attorney in fact believed, quite mistakenly, that his clients were not obligated to respond to the complaint as served on them, and incurred no great risks in failing to do so. He was grossly mistaken on both points. The resulting default and default judgment were unquestionably the product of attorney fault, and defendants were entitled to relief under the mandatory provisions of section 473(a).

This conclusion makes it unnecessary to consider defendants' argument that the judgment must be modified because its decree is, among other things, excessively vague.

## DISPOSITION

The judgment is reversed with directions to set aside the underlying default.

Premo, J., and Elia, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 24, 2010, S179107. Baxter, J., did not participate therein. Corrigan, J., was of the opinion that the petition should be granted.